ACCEPTED
12-14-00117-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
11/2/2015 3:10:02 PM
Pam Estes
CLERK

**NO. 12-14-00117-CV**

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
11/2/2015 3:10:02 PM
PAM ESTES
Clerk

**IN THE COURT OF APPEALS
FOR THE TWELFTH DISTRICT OF TEXAS
AT TYLER, TEXAS**

---

**AMERICAN DREAM TEAM, INC.,
Appellant,**

**v.**

**CITIZENS STATE BANK,
Appellee.**

---

**On Appeal from the 173rd District Court
Henderson, County, Texas
Cause No. 2012-0912
(Hon. Dan Moore)**

---

**APPELLANT'S MOTION FOR REHEARING**

---

Respectfully Submitted,

**COOPER & SCULLY, P.C.**
**DIANA L. FAUST**
diana.faust@cooperscully.com
Texas Bar No. 00793717
**MICHELLE E. ROBBERSON**
michelle.robberson@cooperscully.com
Texas Bar No. 16982900

900 Jackson Street, Suite 100
Dallas, Texas 75202
(214) 712-9500
(214) 712-9540 (fax)

**ATTORNEY AT LAW**
**JOHN EMMETT**
john-emmett@att.net
Texas Bar No. 06610000

12339 Brittany Circle
Dallas, Texas 75230
(972) 851-9904
(972) 851-9905 (fax)

**ATTORNEYS FOR APPELLANT**

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS .................................................................................... i

TABLE OF AUTHORITIES ............................................................................. ii

I. STATEMENT OF THE ISSUES ON REHEARING ................................ vi

II. INTRODUCTION ...................................................................................1

III. ARGUMENT ..........................................................................................1

    A. Standards of Review Favor Nonmovant ADT .....................................1

    B. ADT Raised Genuine Issues of Material Fact on Challenged Elements of Common-Law Fraud .......................................................3

        1. Fact Issue: Whether CSB Made a Misrepresentation...............3

            a. Payne's Testimony Regarding Teller McDougald...........4

            b. Blaase's Testimony Regarding Teller Hill .....................5

        2. Fact Issue: Whether Tellers' Statements Were Made Recklessly and Without Knowledge of the Truth.....................6

        3. Fact Issue: Whether ADT Justifiably Relied on the Misrepresentation .................................................................9

            a. Improper Burden...........................................................10

            b. Improper Factfinding .....................................................11

            c. Improper Analysis .........................................................14

    C. Alternatively, Trial Court Abused its Discretion in Striking ADT's Evidence ...........................................................................15

CERTIFICATE OF COMPLIANCE ...............................................................21

CERTIFICATE OF SERVICE.........................................................................21

i

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Am. Dream Team, Inc. v. Citizens St. Bank*,
  No. 12-14-00117-CV, 2015 WL 5439686
  (Tex. App.—Tyler, Sept. 16, 2015, no pet. h.) ................. 1, 3, 7, 8, 9, 10, 14, 15

*Amedisys, Inc. v. Kingwood Home Health Care, L.L.C.*,
  437 S.W.3d 507 (Tex. 2014) ............................................................................. 1

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ....................................................................................2, 3

*Bank of Tex., N.A. v. Glenny*,
  405 S.W.3d 310 (Tex. App.–Dallas 2013, no pet.) ....................................11, 13

*Barraza v. Eureka Co.*,
  25 S.W.3d 225 (Tex. App.—El Paso 2000, pet. denied) ............................15, 16

*Blake v. Intco Invs. of Tex., Inc.*,
  123 S.W.3d 521 (Tex. App.–San Antonio 2003, no pet.) ............................... 17

*Buchanan v. Davis*,
  15 S.W.2d 562 (Tex. Comm'n App. 1929, judgm't aff'd) ................................. 8

*Cantey Hanger, L.L.P. v. Byrd*,
  467 S.W.3d 477 (Tex. 2015) ........................................................................2, 7

*Chau v. Riddle*,
  254 S.W.3d 453 (Tex. 2008) ........................................................................... 2

*Field v. Mans*,
  516 U.S. 59 (1995) ....................................................................................11, 14

*Ford Motor Co. v. Ridgway*,
  135 S.W.3d 598 (Tex. 2004) ........................................................................... 1

*Gallegos v. Johnson*,
  No. 13-07-00603-CV, 2010 WL 672934
  (Tex. App.—Corpus Christi, Feb. 25, 2010, no pet.) ....................................... 16

ii

*Geosearch, Inc. v. Howell Petroleum Corp.*,
  819 F.2d 521 (5th Cir. 1987)................................................................ 11

*Gotham Ins. Co. v. Warren E&P, Inc.*,
  455 S.W.3d 558 (Tex. 2014).................................................................. 2

*Grant Thornton L.L.P. v. Prospect High Income Fund*,
  314 S.W.3d 913 (Tex. 2010)............................................................11, 12

*Guthrie v. Suiter*,
  934 S.W.2d 820 (Tex. App.–Houston [1st Dist.] 1996, no writ)....................... 17

*Hamilton v. Wilson*,
  249 S.W.3d 425 (Tex. 2008).............................................................2, 10, 15

*Hinojosa v. Columbia/St. David's Healthcare Sys., L.P.*,
  106 S.W.3d 380 (Tex. App.—Austin 2003, no pet.)....................................... 16

*Moss v. Littleton*,
  No. 3:01-CV-2260-L, 2002 WL 31156405 (N.D. Tex., Sept. 26, 2002)........... 11

*Mumphord v. First Victoria Nat'l Bank*,
  605 S.W.2d 701 (Tex. Civ. App.–Corpus Christi 1980, no writ)....................... 8

*Neely v. Wilson*,
  418 S.W.3d 52 (Tex. 2013)...............................................................1, 2

*Orca Assets, G.P. v. JPMorgan Chase Bank*,
  No. 05-13-01700-CV, 2015 WL 4736786
  (Tex. App.—Dallas, Aug. 11, 2015, pet. filed) (mem. op.) .........................11, 13

*Orion Ref. Corp. v. UOP*,
  259 S.W.3d 749 (Tex. App.–Houston [1st Dist.] 2007, pet. denied)................... 8

*Prize Energy Resources, L.P. v. Cliff Hoskins, Inc.*,
  345 S.W.3d 537 (Tex. App.—San Antonio 2011, no pet.) ............................. 11

*Ramirez v. Colonial Freight Warehouse Co.*,
  434 S.W.3d 244 (Tex. App.–Houston [1st Dist.] 2014, pet. denied).............16, 17

*Rogers v. Ricane Enterprises, Inc.*,
  772 S.W.2d 76 (Tex. 1989).................................................................. 16

iii

*Tex. Dep't of Pub. Safety v. Rolfe*,
   986 S.W.2d 823 (Tex. App.—Austin 1999, no pet.)........................................... 9

*Tex. Prudential Ins. Co. v. Padgett*,
   120 S.W.2d 927 (Tex. Civ. App.—Waco 1938, no writ).................................... 9

**Rules**                                                                **Page(s)**

TEX. R. APP. P. 49.9 ........................................................................................ vi

**IN THE COURT OF APPEALS
FOR THE TWELFTH DISTRICT OF TEXAS
AT TYLER, TEXAS**

**AMERICAN DREAM TEAM, INC.,**
**Appellant,**

**v.**

**CITIZENS STATE BANK,**
**Appellee.**

**On Appeal from the 173rd District Court
Henderson, County, Texas
Cause No. 2012-0912
(Hon. Dan Moore)**

**APPELLANT'S MOTION FOR REHEARING**

**TO THE HONORABLE JUSTICES
OF THE TWELFTH COURT OF APPEALS:**

Appellant American Dream Team, Inc. ("ADT" or "Appellant") respectfully moves this Court for rehearing, pursuant to rule 49.1 of the Texas Rules of Appellate Procedure, and urges this Court to reconsider its Opinion affirming the trial court's Final Summary Judgment in favor of Appellee Citizens State Bank ("CSB" or "Appellee"). In support of its Motion, Appellant respectfully represents as follows:

# I.  STATEMENT OF THE ISSUES ON REHEARING

Without waiving its right to seek review by the Texas Supreme Court[1] of any or all issues presented on appeal, ADT respectfully presents the following issues for this Court's consideration on rehearing:

1.     Respectfully, this Court failed to apply or misapplied the standards of review applicable to summary judgments that favor the nonmovant (here, ADT). In its Opinion, the Court appeared to disregard some or all of ADT's summary judgment evidence and to impose burdens on ADT contrary to the law, rather than taking ADT's evidence as true and indulging all reasonable inferences and resolving all doubts in ADT's favor.  Applying the proper burdens and standards of review to the summary judgment evidence relating to ADT's claim for common-law fraud, the Court should have concluded that ADT raised genuine issues of material fact on each of the challenged elements of its claim.  Therefore, the summary judgment on the fraud claim should be reversed and the claim remanded for a jury trial.

2.     Alternatively, the Court erred in concluding that the trial court did not abuse its discretion in striking ADT's summary judgment evidence on grounds it was voluminous or that ADT did not specifically reference it in its responses to CSB's motions for summary judgment.   Under Texas law, ADT provided

---

[1]     *See* TEX. R. APP. P. 49.9.

sufficient references to its summary judgment evidence, the evidence was not voluminous under prevailing standards, and all the evidence was relevant to ADT's response to CSB's motion for summary judgment, which addressed all claims asserted by ADT. To the extent the Court upholds its prior ruling that ADT's (non-excluded) evidence did not raise fact issues on fraud, then the striking of ADT's other deposition evidence resulted in harmful error; if that evidence had been considered, it would have raised fact issues on the challenged elements. If the Court is inclined to uphold its ruling that ADT's non-excluded evidence did not raise fact issues on fraud, the Court should reverse the trial court's ruling on the striking of ADT's evidence and should consider ADT's additional evidence in ruling on this Motion as to the fraud claim.

## II.   INTRODUCTION

In this appeal from a final summary judgment on all of ADT's claims and CSB's counterclaim, this Court issued its Opinion on September 16, 2015, affirming the summary judgment on all grounds. *Am. Dream Team, Inc. v. Citizens St. Bank*, No. 12-14-00117-CV, 2015 WL 5439686 (Tex. App.—Tyler, Sept. 16, 2015, no pet. h.) (not yet reported). Here, ADT challenges this Court's rulings on its claim for common-law fraud and, if necessary, the trial court's striking of ADT's evidence. ADT respectfully requests the Court reconsider its Opinion, grant rehearing, and, upon reconsideration, reverse the summary judgment on the common-law fraud claim and remand it for trial.

## III.   ARGUMENT

### A.   Standards of Review Favor Nonmovant ADT

Although the Court discussed the summary judgment burdens and standards of review in its Opinion, it did not appear to apply those, at least based on the discussion in the Opinion. ADT's only burden as the nonmovant was to present summary judgment evidence raising a fact issue on at least one element of the claim (traditional) or on the challenged elements (no-evidence). *E.g.*, *Amedisys, Inc. v. Kingwood Home Health Care, L.L.C.*, 437 S.W.3d 507, 511 (Tex. 2014) (traditional); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004) (no-evidence). A fact issue exists if the record contains more than a scintilla of probative evidence. *Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013).

In deciding whether the nonmovant produced more than a scintilla of evidence, this Court must review the summary judgment record "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *Id.* at 60. This Court must take as true all evidence favorable to the nonmovant. *E.g.*, *Cantey Hanger, L.L.P. v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Texas Supreme Court has reversed summary judgments when a court of appeals failed to properly apply the standards of review. *E.g.*, *Gotham Ins. Co. v. Warren E&P, Inc.*, 455 S.W.3d 558, 568 (Tex. 2014) (court of appeals erred in relying solely on testimony it deemed "unequivocal"; court failed to consider other testimony in record, which raised fact issue); *Chau v. Riddle*, 254 S.W.3d 453, 455-56 (Tex. 2008) (per curiam) (court of appeals erred in ignoring plaintiff's summary judgment evidence, which raised fact issue on defendant's affirmative defense); *Hamilton v. Wilson*, 249 S.W.3d 425, 426-27 (Tex. 2008) (plaintiff "was not required to prove the facts as she alleged them"; plaintiff required only to provide evidence raising genuine fact issues). Respectfully, in its Opinion, this Court misapplied or failed to apply some of these rules.

**B. ADT Raised Genuine Issues of Material Fact on Challenged Elements of Common-Law Fraud**

CSB challenged three elements of ADT's common-law fraud: CSB did not make a misrepresentation; if CSB did, it did not do so with knowledge or recklessly, as a positive assertion, without knowledge of the truth; and ADT did not justifiably rely on the misrepresentation. (CR.4:519-22, 530-31). Respectfully, contrary to this Court's Opinion, the summary judgment evidence presented genuine issues of material fact on these elements, which precluded summary judgment for CSB. "[T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury *might* return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Anderson*, 477 U.S. at 257 (emphasis added).

### 1. *Fact Issue: Whether CSB Made a Misrepresentation*

In its Opinion, this Court ruled that statements by the two bank tellers who responded to ADT's inquiries about whether the check had cleared were not false and, thus, were not misrepresentations. *American Dream*, 2015 WL 5439686 at *6-7. This Court quoted summary judgment evidence consisting of statements from one teller, who said "the funds were there," referring to the provisional credit given to ADT pending collection on the international check. *Id.* at *6. But, the Court failed to discuss other summary judgment evidence relating to ADT's question to the tellers of whether the "check had cleared" – meaning the

international check itself, as opposed to whether "the funds were there" because of a provisional credit. Here, whether the "check had cleared" is an entirely separate question from whether "the funds were there," and it is the core of ADT's common-law fraud claim. (*See* CR.3:273). A "yes" answer by the tellers to ADT's question about whether the "check had cleared," when it undisputedly had not cleared and never cleared, at least raised a fact question as to whether the tellers' "yes" answers were false statements and, thus, misrepresentations.

### a. Payne's Testimony Regarding Teller McDougald

In ADT President Janet Payne's deposition, Payne testified that she spoke with CSB President Leland Pitts about the check when she presented it for deposit (around February 11, 2010). (CR.3:312-13). Pitts explained the international check had to be sent for collection, and he had bank teller Heather McDougald help Payne with the deposit. (CR.3:313). McDougald told Payne she would let Payne know when the check cleared.[2] (CR.3:312-13). Payne understood this discussion to mean that CSB was going to make sure the check was good and notify her when it was. (CR.3:315). Payne spoke to McDougald at least three times after the initial deposit, inquiring whether the bank had heard anything about

---

[2]    McDougald testified that ADT Vice President Robert Blaase, rather than Payne, brought in the check. (CR.3:426). Still, McDougald told Blaase she would call when the bank knew the funds were available, which could take at least one month and possibly two months, and he said "that was fine, to call him when it was cleared or when the funds became available, that we knew the check was good." (CR.2:161; 3:427).

whether the check was good, and each time McDougald had said "no."[3] (CR.3:316).

In her affidavit, Payne testified that she was at the bank making deposits on March 1, 2010, and she again asked McDougald "to check on the status of such check to see if it had cleared." (CR.3:298-99; *see also* CR.3:316). Payne stated McDougald looked at her computer monitor and responded, "the funds were there and it looks like they're good." (CR.3:299, 316, 324).

Taking this evidence as true, and resolving all doubts and inferences in favor of ADT, the reasonable inference from this evidence was that McDougald knew the check was an international check and knew ADT was waiting to do anything with the funds until it had confirmation the check had cleared, not just confirmation that the provisional credit was in the account. Accordingly, McDougald's answer that "the funds are there and it looks like they're good," in response to the question whether the "check had cleared," was a false answer. At the least, the evidence raised a fact question as to whether McDougald's answer was false and, thus, a misrepresentation.

### b. Blaase's Testimony Regarding Teller Hill

ADT Vice President Robert Blaase testified that, when he went to the bank on March 2, 2010, after Payne told him McDougald had stated the check had

---

[3]    Blaase testified he had made similar inquiries to Pitts during the same time period – asking Pitts at least three to five times whether the check had cleared. (CR.2:148-49; CR.3:300).

cleared (CR.3:301), he told teller Laura Hill he needed to wire money but said, "I want to make sure that this check has cleared. We've been told that it has, Jan[et Payne] had been told that it has." (CR.2:147). Blaase testified that Hill looked at her computer screen and, after 10-15 seconds, answered "yes" to his question. (*Id.*). Viewing this evidence in the light most favorable to ADT, Hill's "yes" answer to Blaase's inquiry whether the "check has cleared" was a false answer because the check had not cleared and never cleared. At the least, this evidence (taken as true and resolving any doubts in favor of ADT) raised a fact question as to whether Hill's answer was false and, thus, a misrepresentation.

Applying the summary judgment standards of review, particularly taking ADT's evidence as true, ADT raised a genuine issue of material fact as to whether the bank tellers' answers were false when made and, thus, misrepresentations. Because a jury is entitled to decide this fact issue, the summary judgment must be reversed and the fraud claim remanded for trial.

> ### 2. *Fact Issue: Whether Tellers' Statements Were Made Recklessly and Without Knowledge of the Truth*

On the second challenged element, whether the misrepresentation was knowing or made recklessly, as a positive assertion, without knowledge of the truth, this Court concluded that the bank tellers' statements were: (a) just "misunderstandings" that could not amount to fraud; and (b) ambiguous, which would not "equate to knowing the representation was false or made without

knowledge of its truth." *American Dream*, 2015 WL 5439686 at *7. This Court concluded "there is no evidence of this element of fraud in the record before us." *Id.*

Respectfully, applying the summary judgment standards of review, the record did contain summary judgment evidence and did raise a genuine issue of material fact as to whether the tellers' misrepresentations were made recklessly, as positive assertions, without knowledge of the truth. As the Court recognized in this section of its Opinion, ADT's Payne and Blaase asked the tellers whether the international check had cleared. *See id.* This testimony must be taken as true. *Byrd*, 467 S.W.3d at 481. As noted, ADT's questions as to whether the check had cleared were completely different from the question of whether, simply looking at the computer screen, ADT's account had funds in it. The evidence is undisputed that both tellers merely looked at their computer screens, without doing any more investigation into whether the check had cleared, and then answered "yes" and "the funds are there" and "it looks like they're good." (CR.2:147; 3:299). As argued above, these answers were false, and, at a minimum, this evidence raised a genuine issue of material fact as to whether the bank tellers' answers were made recklessly, as positive assertions, and without knowledge of the truth.

Moreover, this Court's statement – that "ADT's president and vice president interpreted the communication differently from the Bank's employees"[4] – effectively resolves a fact question and, respectfully, makes the Court a factfinder, contrary to Texas law. How ADT personnel and CSB personnel interpreted the questions and the answers regarding whether the check had cleared, as well as whether those interpretations were just a "misunderstanding" or were instead reckless misrepresentations, are fact issues a jury should decide, not this Court on appellate review.[5]

As to the Court's conclusion that the bank tellers' statements were ambiguous and, thus, cannot be reckless misrepresentations,[6] this conclusion also impermissibly substituted this Court as a factfinder and resolved a factual dispute that should instead be resolved by a jury. Under Texas law, when a witness's testimony is ambiguous, the meaning to be ascribed to the testimony is a question for the jury or factfinder to decide. *See, e.g.*, *Buchanan v. Davis*, 15 S.W.2d 562,

---

[4] *Id.* at *7.

[5] The cases the Court cites regarding "misunderstanding" are distinguishable. In *Orion Ref. Corp. v. UOP*, 259 S.W.3d 749 (Tex. App.–Houston [1st Dist.] 2007, pet. denied), the summary judgment record contained an email where the plaintiff admitted to a misunderstanding. *Id.* at 771. The record here contains no such admission. In *Mumphord v. First Victoria Nat'l Bank*, 605 S.W.2d 701 (Tex. Civ. App.–Corpus Christi 1980, no writ), the appellate court held the plaintiff proved only a misunderstanding, rather than a misrepresentation, when the plaintiff admitted that no one (either bank personnel or the trustee) told her the foreclosure sale would be postponed. *Id.* at 704. The record here differs because it contains affirmative statements from the tellers.

[6] *Id.* at *7.

562 (Tex. Comm'n App. 1929, judgm't aff'd) (jury should decide); *Tex. Dep't of Pub. Safety v. Rolfe*, 986 S.W.2d 823, 826 (Tex. App.—Austin 1999, no pet.) (administrative law judge should decide); *Tex. Prudential Ins. Co. v. Padgett*, 120 S.W.2d 927, 929 (Tex. Civ. App.—Waco 1938, no writ) (jury should decide). Here, if the questions and answers were, in fact, ambiguous (which ADT does not concede), then the meaning of the ambiguous testimony of Payne, Blaase, and the tellers is a fact issue that a jury must decide.

Respectfully, if the Court had considered all of ADT's summary judgment evidence, and if the Court had applied the summary judgment standards of review that favor ADT, the Court should have concluded that ADT's evidence raised a genuine issue of material fact on the reckless misrepresentation element. Because a jury must resolve this fact issue, this Court should reverse the summary judgment on the common-law fraud claim and remand it for trial.

### 3. *Fact Issue: Whether ADT Justifiably Relied on the Misrepresentation*

On the third challenged element, whether ADT justifiably relied on the misrepresentation, this Court appeared to conclude (without expressly stating) that, as a matter of law, ADT's reliance on the tellers' representations that the check had cleared was not justifiable. *American Dream*, 2015 WL 5439686 at *7-8. The Court identified what it considered to be "red flags" regarding ADT's foreign transaction with Lopez and relied on those "red flags" to conclude that ADT could

not have justifiably relied on the tellers' representations that the check had cleared and, thus, it was safe to send the $30,000 wire transfer. *See id.* The Court appeared to consider some of ADT's summary judgment evidence, but not all of it, and the Court did not appear to apply the summary judgment standards of review to it.

CSB did not conclusively establish a lack of justifiable reliance, as it spent only one paragraph on this element in its traditional motion for summary judgment and cited no evidence in support of its argument. (CR.4:522). In fact, CSB never mentioned "red flags" in any of its summary judgment filings and never asked the trial court to conclude, as a matter of law, that "red flags" negated justifiable reliance. (CR.1:75-100; CR.4:445-48, 481-82, 505-32, 533-58).[7]

### a.     Improper Burden

Nonetheless, the Court's Opinion on justifiable reliance raises several issues. First, the Court held that "ADT failed to establish the justifiable reliance element of its fraud cause of action." *American Dream*, 2015 WL 5439686 at *8. Under Texas law, it was not ADT's burden to "establish" any element of its fraud claim. *Hamilton*, 249 S.W.3d at 426-27. Rather, as the nonmovant, ADT's only burden was to present evidence raising a genuine issue of material fact on the reliance

---

[7]     ADT complained of CSB's failure to plead and argue "red flags" in the trial court. (*See* Reply Brief at 9-10).

element.  *See* TEX. R. APP. P. 166a(i).  Respectfully, the Court erred by imposing an improper burden on ADT.

### b.    Improper Factfinding

Second, the Court failed to apply the summary judgment standards of review to the evidence in the record, and, instead, made its own determination of the credibility of the witnesses, the weight to give their testimony, the weight to give to the supposed "red flags," and the ultimate issue – whether ADT's reliance on the tellers' statements to the effect that the "check had cleared" was justifiable.  Many Texas courts recognize that whether reliance is justifiable in a fraud claim generally is a fact question for the jury.  *E.g.*, *Orca Assets, G.P. v. JPMorgan Chase Bank*, No. 05-13-01700-CV, 2015 WL 4736786 at *9 (Tex. App.—Dallas, Aug. 11, 2015, pet. filed) (mem. op.); *Bank of Tex., N.A. v. Glenny*, 405 S.W.3d 310, 318 (Tex. App.–Dallas 2013, no pet.); *Prize Energy Resources, L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 585 (Tex. App.—San Antonio 2011, no pet.); *Geosearch, Inc. v. Howell Petroleum Corp.*, 819 F.2d 521, 527 (5th Cir. 1987) (Texas law); *Moss v. Littleton*, No. 3:01-CV-2260-L, 2002 WL 31156405 at *2 (N.D. Tex., Sept. 26, 2002) (unpublished) (Texas law).

This stems, in part, from the inherently factual nature of the reliance inquiry, which includes consideration of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case.  *E.g.*, *Field v. Mans*, 516 U.S. 59, 71 (1995).  In the "red flags" case relied upon by the Court, *Grant Thornton*

*L.L.P. v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010), the Texas Supreme Court stated that, "[i]n measuring justifiability, we must inquire whether, given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud, it is extremely unlikely that there is actual reliance on the plaintiff's part." *Id.* at 923.

Unlike this case, however, *Grant Thornton* involved highly sophisticated business entities (global accounting firm, bond funds and hedge funds, and global lenders) with extensive experience in the bond market and billions in assets. *Id.* at 915-17. The supreme court rendered judgment for the accounting firm, concluding the plaintiffs/investors could not have justifiably relied on the accounting firm's audit reports and other statements, given their undisputed knowledge that the bond seller had lost its primary source of funding and that this loss created a substantial risk that any bonds purchased would not be redeemed for face value. *Id.* at 923-24.

Here, on the other hand, the summary judgment evidence showed ADT was not a highly sophisticated business with international clients and global banking experience. Payne and Blaase both testified this was their first experience with a check drawn on a foreign bank. (CR.3:298, 300). Pitts also had not been involved with collection on a foreign bank's check. (CR.2:175). ADT broker Trena Davis testified this transaction was only her second deal with a foreign buyer. (CR.2:190).

CSB executive vice president Rita Bristow confirmed that checks drawn on foreign banks are governed by different rules. (CR.4:594). Bristow also testified that the check itself did not raise a suspicion of fraud to her, prior to it being returned. (CR.4:576-77).

Given their lack of experience, both Payne and Blaase contacted McDougald and Pitts multiple times after presenting the check for deposit to determine whether the check had cleared. (CR.2:148-49; 3:300, 316). The bank personnel knew that ADT did not want to disburse any funds until it had confirmation the check had cleared. (CR.2:161; 3:315, 427). Both Blaase and Davis testified they were trusting and relying on the bank to tell them whether the check had cleared, and Blaase told Pitts no withdrawals could be made from the account until that check had cleared. (CR.2:200; 3:301). Payne and Blaase both testified they would not have wired the funds if they had known the check had not cleared. (CR.3:301, 318).

Even considering the evidence of purported "red flags" listed in the Court's Opinion, this additional evidence must be taken as true and viewed in ADT's favor. Doing so, ADT raised a genuine issue of material fact regarding whether its reliance on the tellers' statements was justifiable, and that issue must be resolved by a jury. *See Orca*, 2015 WL 4736786 at *9 (red flags and other evidence raised fact issue); *Glenny*, 405 S.W.3d at 318 (evidence raised fact issue on reliance and

no red flags negated reliance). Given the inexperience of the parties, this is not a case where the evidence conclusively established that actual reliance was "extremely unlikely." Respectfully, the Court usurped the jury's role when it judged the impact of the purported "red flags," determined ADT's mindset and alleged lack of diligence, discounted ADT's evidence, and concluded as a matter of law that reliance was not justified.

### c. Improper Analysis

Third, the Court cited to the U.S. Supreme Court's opinion in *Field v. Mans* for the proposition that a "fraud plaintiff cannot recover if he blindly relies upon a misrepresentation, the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *American Dream*, 2015 WL 5439686 at *8. However, that quote from *Field* continues to say that, "[o]n the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses." *Field*, 516 U.S. at 71. Here, CSB was the only party with access to the critical information (whether the check had cleared).

The *Field* court also recognized that, under the common law of fraud, while the plaintiff's reliance must be justifiable, that does not mean his conduct must conform to a reasonable man standard – the justifiability of the reliance depends on the facts of each case, not a community standard. *Id.* at 70-71. Therefore, even under *Field*, whether the alleged "red flags" should have alerted ADT to a possible

scam and, thus, whether its reliance on the tellers' statements was justifiable, is a fact question unique to this case that should be resolved by a jury. The Court should, on rehearing, reverse the summary judgment on the fraud claim and remand it for trial.

**C.** **Alternatively, Trial Court Abused its Discretion in Striking ADT's Evidence**

If this Court is inclined to uphold its conclusion that the above-discussed evidence did not raise fact issues on fraud, this Court should reconsider its ruling upholding the trial court's striking of ADT's summary judgment evidence, consisting of deposition testimony from Payne, Blaase, Pitts, and McDougald that ADT did not specifically cite in its responses. *American Dream*, 2015 WL 5439686 at *11. Respectfully, the trial court abused its discretion in striking the depositions because they were not voluminous under prevailing law and were highly relevant to ADT's claims, given that CSB sought summary judgment on ADT's whole case. The striking was harmful because the struck evidence, if considered, raised/supported fact issues on the fraud elements.

With a no-evidence motion, the nonmovant is "'not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements.'" *Hamilton*, 249 S.W.3d at 426. Rule 166a(d) allows a nonmovant to rely on depositions when it files them in an appendix (as here), and its response clearly relies on the depositions (as here). *Barraza v. Eureka Co.*, 25

S.W.3d 225, 228-29 (Tex. App.—El Paso 2000, pet. denied).  Rule 166a(d) does not require specific references to the depositions, if the actual documents are before the trial court, for the trial court to consider them.  *See id.* at 228.

When the nonmovant attaches the evidence, provides specific references to the evidence that particularly supports the argument (approximately 20), and the evidence is not voluminous (278 pages or less), a trial court abuses its discretion in striking the evidence.  *Id.* at 229-30; *Hinojosa v. Columbia/St. David's Healthcare Sys., L.P.*, 106 S.W.3d 380, 387-88 (Tex. App.—Austin 2003, no pet.) (nonmovant need not set out exact evidence or explain with specificity how evidence supports its arguments; evidence need only be referenced or attached for court to consider it); *see also Gallegos v. Johnson*, No. 13-07-00603-CV, 2010 WL 672934 at *6-7 (Tex. App.—Corpus Christi, Feb. 25, 2010, no pet.) (185 condensed pages of depositions was not voluminous, evidence was relevant to plaintiff's responsive arguments, and plaintiff referenced deposition testimony; thus, trial court erred in not considering evidence).

Respectfully, the cases cited in the Opinion are distinguishable.  This case differs from *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76 (Tex. 1989), because the MSJ there merely directed the trial court to the evidence "on file," which was voluminous, and the movant failed to show the trial court did or could have considered the evidence.  *Id.* at 81.  In *Ramirez v. Colonial Freight*

*Warehouse Co.*, 434 S.W.3d 244 (Tex. App.–Houston [1st Dist.] 2014, pet. denied), the appellate court held that the deposition was not voluminous (110 pages) and that the plaintiff made sufficient references to the deposition, such that the trial court erred in not considering it. *Id.* at 250-51. *Blake v. Intco Invs. of Tex., Inc.*, 123 S.W.3d 521 (Tex. App.–San Antonio 2003, no pet.), provides no precedent here because the nonmovant there attached no evidence to her response; thus, the trial court was not required to search the record for evidence supporting the nonmovant's contentions. *Id.* at 525. *Guthrie v. Suiter*, 934 S.W.2d 820 (Tex. App.–Houston [1st Dist.] 1996, no writ), is distinguishable because the nonmovant attached a voluminous (500 pages) deposition but provided no references to any of the testimony. *Id.* at 826.[8]

Here, the depositions were not voluminous, compared to the cases discussed above:  excluding certifications and indices, the four depositions totaled 312 pages, which were condensed to 81 pages.  (CR.3:305-443).  ADT cited to those pages of the depositions that particularly supported its arguments (roughly 25), and discussed how the testimony raised fact issues on the challenged elements. (CR.3:273-96; 5:611-29).  Applying rules 166a(d) and (i), *Hamilton*, *Barraza*, *Hinojosa*, and *Gallegos*, the trial court abused its discretion in striking and refusing

---

[8]    The *Guthrie* court, however, did agree that rule 166a(d) permits a party to attach an entire deposition as summary judgment proof. *Id.* at 826.

to consider the uncited portions of ADT's deposition evidence. The ruling should be reversed and the additional evidence considered.

The additional deposition testimony would have raised/supported a fact issue on falsity: Payne discussed when she was in the bank, asking McDougald about whether the check had cleared and how she had been told it was good (CR.3:315; 323); Blaase discussed Payne telling him what McDougald told her (CR.3:349, 359, 366) and what Hill told him (CR.3:359); and Pitts discussed what Hill told him, including that Blaase asked whether the Canadian check had cleared (CR.3:397). The additional testimony would have raised/supported a fact issue on reckless misrepresentation: Blaase discussed his conversation with Hill (CR.3:359) and how he was told the check had cleared when it had not (CR.3:367).

And, the additional testimony would have raised/supported a fact issue on justifiable reliance: Payne said her only concern about the transaction was the two amounts on the check, and she trusted the bank to find out if the check was good (CR.3:312, 316); Payne did not think the transaction was suspicious because ADT always follows the client's instructions (CR.3:324); this was Blaase's first wire transfer, and he wired the money based on the bank telling him it was okay to do so (CR.3:349, 357, 367); and it was not unusual for ADT to accept money to purchase things for its clients or to hold money in escrow prior to a contract being signed (CR.3:352, 361). Thus, the trial court's error in striking the deposition

testimony was harmful and its ruling should be reversed, and this Court should consider this additional evidence in deciding whether ADT raised fact issues on fraud.

**THEREFORE**, Appellant respectfully prays this Court grant this Motion, withdraw its Opinion, and upon reconsideration, reverse the Final Summary Judgment on the common-law fraud claim and, if needed, the ruling striking ADT's evidence. Appellant prays for all further relief as this Court deems just.

Respectfully submitted,

**COOPER & SCULLY, P.C.**

By: /s/ Diana L. Faust

**DIANA L. FAUST**
diana.faust@cooperscully.com
Texas Bar No. 00793717
**MICHELLE E. ROBBERSON**
mchelle.robberson@cooperscully.com
Texas Bar No. 16982900

900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Facsimile: (214) 712-9540

**ATTORNEY AT LAW**
**JOHN EMMETT**
john-emmett@att.net
Texas Bar No. 06610000
12339 Brittany Circle
Dallas, Texas 75230
Telephone: (972) 851-9904
Facsimile: (972) 851-9905

**ATTORNEYS FOR APPELLANT**
**AMERICAN DREAM TEAM, INC.**

## CERTIFICATE OF COMPLIANCE

I hereby certify that we prepared this Motion for Rehearing using Microsoft Word 2003, which indicated that the total word count (exclusive of those items listed in rule 9.4(i)(1) of the Texas Rules of Appellate Procedure, as amended) is 4,479 words.

    /s/ Diana L. Faust
**DIANA L. FAUST**

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of this Motion for Rehearing on the following counsel of record, on the 2nd day of November 2015, by the method indicated:

Mr. Scott A. Ritcheson                         **VIA EFILE**
scottr@rllawfirm.net
Ritcheson, Lauffer & Vincent, P.C.
821 ESE Loop 323, Suite 530
Tyler, Texas 75701
**Counsel for Appellee**

    /s/ Diana L. Faust
**DIANA L. FAUST**

NO. 12-14-00117-CV

IN THE COURT OF APPEALS
FOR THE TWELFTH DISTRICT OF TEXAS
AT TYLER, TEXAS

AMERICAN DREAM TEAM, INC.,
Appellant,

v.

CITIZENS STATE BANK,
Appellee.

On Appeal from the 173rd District Court
Henderson, County, Texas
Cause No. 2012-0912
(Hon. Dan Moore)

APPENDIX TO APPELLANT'S MOTION FOR REHEARING

In compliance with rule 38.1(k) of the Texas Rules of Appellate Procedure,

Appellant American Dream Team, Inc. submits this Appendix to its Motion for

Rehearing containing the following items:

Tab A:    Judgment and Opinion, *American Dream Team, Inc. v. Citizens State Bank*, No. 12-14-00117-CV, 2015 WL 5439686 (Tex. App.—Tyler, Sept. 16, 2015, no pet. h.).

D/935443v4

# APPENDIX TAB "A"

# NO. 12-14-00117-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *AMERICAN DREAM TEAM, INC.,* *APPELLANT* | § | *APPEAL FROM THE 173RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *CITIZENS STATE BANK,* *APPELLEE* | § | *HENDERSON COUNTY, TEXAS* |

## *OPINION*

American Dream Team, Inc. (ADT) filed suit against Citizens State Bank alleging the Bank had improperly charged back $30,000.00 against its account for a provisional credit extended on a counterfeit check. The trial court granted the Bank's motion for traditional and no evidence summary judgment, rendering a take nothing judgment on all of ADT's claims, and awarding attorney's fees to the Bank. In six issues, ADT contends the trial court reversibly erred. We affirm.

## BACKGROUND

ADT is a real estate brokerage firm specializing in selling properties in the Cedar Creek Lake area of Henderson County, Texas. On January 23, 2010, it received the following system wide email sent by the marketer Point2 Real Estate:

23-Jan-2010

Prospect Email

You are receiving this email because Mr. Yang Hua Lopez has emailed you from your website.

Email:   yanghl@informaticos.com

Dear Sir/Madam, I am Mr. Yang Hua Lopez currently the Chief Financial Officer (CFO) Hangzhou Iron & Steel Group Company (HISGC) Website: http://www.hazsteel.com I am retiring soon will be relocating to Texas for Good, after searching the Internet for a reliable real estate agent I found your firm have decided to choose your firm to buy my permanent home.  The home

will be a cash buy and I will fly to your city for viewing the property but before that I would like my stock broker in America to send the money to your firm via a lawyer/solicitor to keep in a trust account upon arrival.  I need a 4 bed rooms/5 bed room's home of $300,000.00USD - $1,200,000.00USD In nice neighborhood in your city and state.  Email is better than telephone due to my accent and english.  Regards, Mr. Yang Hua Lopez Chief Financial Officer, Email; yanghl@informaticos.com

Manage Prospect – Mr. Yang Hua Lopez

The following day, Trena Davis, a real estate agent with ADT, responded to Lopez by email stating that she would be happy to assist him in his home search.  Upon his request, she sent him more than ten prospective properties meeting his stated requirements.  Within an hour and a half, Lopez chose what he described as his "dream home" in Lewisville, Texas, more than eighty miles away from Cedar Creek Lake.  Davis then sent Lopez a buyer's representation agreement, which she requested he sign and return to her.  On January 27, Lopez sent Davis the following email:

Dear Trena,

I would like to inform you that my stock broker has sent you a payment of $105,000.00USD ($500,000.00USD) will be down payment of the property the rest will be completed upon my arrival and ($98,000.00USD) will be for the purchacse [sic] of Chinese home style furniture, Chinese style home entertainment, Chinese home decoration and Chinese kitchen appliance in China.

Please update me once you receive the payment.

Regards,
Mr. Yang Hua Lopez
Chief Financial Officer
Hangzhou Iron & Steel Group Company
Banshan County, Gongshu Dct,
Hangzhou Zhejiang 310022 China.
Tel: +86 10868 99249
Email: yanghua@ejecutivos.com
Website: http://www.hazsteel.com

On February 8, Davis emailed Lopez that she had not received the funds that had purportedly been sent January 27.  Nor had she received the buyer's representation agreement from Lopez.  In response, Lopez sent Davis the following email:

From:     yanghl@informaticos.com

Sent:     Wednesday, February 10, 2010 8:13 AM

2

To:      trena.davis@coldwellbankeradr.com

Subject: Dear Trena (update)

Dear Trena

I would like to inform you that my stock broker firm has sent you a new payment of $35,000 via UPS ($5000.00USD) will be the down payment of the property the balance will be completed upon my arrival and ($30,000.00USD) will be for the purchacse [sic] of Chinese home style furniture, Chinese home style entertainment, Chinese home decoration and Chinese kitchen appliance in China.

You will receive it today via ups, update me once you receive it, have a nice day.

Regards,
Mr. Yang Hua Lopez
Chief Financial Officer.

On the same day, ADT received a check from a "Mr. Green Sound," identifying himself as Mr. Lopez's account manager. The check had two different amounts on its face. In numerals, it stated "$35,000.00USD," and in writing, it stated "THIRTY THOUSAND AND 00/100 US DOLLARS." The check's drawer was AXA Insurance Company of Canada with the payer bank being the Bank of Montreal in Toronto, Ontario.

On February 11, ADT deposited the check into its escrow account at the Bank. The deposit slip was filled out by Jan Payne, ADT's president, in the amount of $35,000.00. ADT's vice president, Robert Blaase, physically made the deposit at the Bank's Seven Points branch. He was told by the branch manager, Leland Pitts, and a Bank employee, Heather McDougald, that because the check was drawn on a foreign bank, it could take between one and two months for the funds to be collected. At the time of their meeting with Blaase while he was making this deposit, McDougald prepared a "foreign check transmittal form." It showed that following Blaase's instructions, ADT was given a provisional credit for the deposited check, pending collection. Blaase had been given a second option to send the check for collection with a minimum $75.00 fee plus possible additional fees from the paying bank, the Bank of Montreal. Taking the second option would have meant that ADT would not receive the provisional credit. But because Blaase chose the option to receive the provisional credit, the funds were immediately available for ADT's use under its deposit and related agreements with the Bank.

On March 1, Payne was told by McDougald, after she had looked on her computer, that "the funds were there" and "it looks like they're good." On March 2, Blaase told Bank teller Laura Hill at the Bank's Mabank branch that he wanted to wire $30,000.00 to a bank in Japan.

3

Before sending the wire, he told Hill that he wanted to make sure that the AXA Insurance Company check had cleared. He testified that she looked at her computer screen and said that it had cleared. The money was wired to Tokyo that day.

On March 15, the Bank and ADT were notified the check was counterfeit. Attempts were made to recover the $30,000.00 wired to the Tokyo bank, but to no avail. The Bank then made a chargeback against ADT's escrow account for $30,000.00.

ADT later filed suit against the Bank to recover the $30,000.00 chargeback based on the following legal theories:

1. Negligent misrepresentation and conversion;
2. Violations of the Deceptive Trade Practices Act (DTPA);
3. Common law fraud;
4. Breach of contract (the deposit agreement), equitable estoppel, and failure to return check;
5. Money had and received; and
6. Promissory estoppel.

The Bank counterclaimed against ADT for its breach of transfer warranties on the counterfeit check and for its attorney's fees pursuant to the deposit agreement. The Bank filed a motion for traditional and no evidence summary judgment asserting that certain claims are barred by limitations, that ADT's fraud claim is preempted by the Uniform Commercial Code (UCC), and that there is no evidence to support ADT's common law causes of action. The Bank also moved for summary judgment on its counterclaim for breach of warranties under the UCC and for attorney's fees. The court rendered judgment that ADT take nothing on its claims against the Bank and awarded the Bank $72,938.00 in attorney's fees against ADT. This appeal followed.

## STANDARD OF REVIEW

Both traditional and no evidence summary judgment claims can be raised in a single motion so long as the motion sufficiently segregates the traditional claims from the no evidence claims. *Gonzalez v. VATR Const. LLC*, 418 S.W.3d 777, 782 (Tex. App.—Dallas 2013, no

4

pet.).  When a party moves for summary judgment on both traditional and no evidence grounds, we first address the no evidence grounds.  *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).  A no evidence challenge will be sustained when

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Id*.  The motion must specifically state the elements for which there is no evidence.  *Salazar v. Ramos*, 361 S.W.3d 739, 745 (Tex. App.—El Paso 2012, pet. denied).

A party moving for traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.  TEX. R. CIV. P. 166a(c).  To determine if there is a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not.  *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  A defendant who conclusively negates at least one of the essential elements of the cause of action or conclusively establishes an affirmative defense is entitled to summary judgment.  *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).  Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact.  *Simulis, L.L.C. v. Gen. Elec. Capital Corp.*, 439 S.W.3d 571, 575 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

## CHAPTER 4 PREEMPTION

In its second issue, ADT contends that the trial court erred in granting summary judgment on the Bank's preemption claim.  ADT asserts that its fraud claim, which was based on the statements made by the Bank's two employees during the check settlement process, was not preempted by the Uniform Commercial Code.

Chapter 4 of the UCC establishes the rights and duties between banks and their customers regarding deposits and collections.  TEX. BUS. & COM. CODE ANN. §§ 4.101-.504 (West 2002 & Supp. 2014); *Am. Airlines Emps. Fed. Credit Union v. Martin*, 29 S.W.3d 86, 91 (Tex. 2000).  Whether Chapter 4 applies is a question of law, which we review de novo.  *Id*.  To the extent they do not conflict with the UCC's provisions, common law principles complement the UCC.

5

***Plano Lincoln Mercury, Inc. v. Roberts***, 167 S.W.3d 616, 624 (Tex. App.—Dallas 2005, no pet.). Principles of law and equity, including fraud and misrepresentation, supplement the provisions of the UCC unless displaced by particular UCC provisions. *See* TEX. BUS. & COM. CODE ANN. § 1.103(b) (West 2009). Additionally, Official Comment 2, Section 1.103 provides further guidance as follows:

> The Uniform Commercial Code was drafted against the backdrop of existing bodies of law, including the common law and equity, and relies on those bodies of law to supplement it [sic] provisions in many important ways. At the same time, the Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise.

TEX. BUS. & COM. CODE ANN. § 1.103 cmt. 2. Thus, a common law cause of action can continue in a commercial law context in Texas when it does not conflict with provisions of the UCC. *See* ***Bryan v. Citizens Nat'l Bank in Abilene***, 628 S.W.2d 761, 764 (Tex. 1982).

Relevant to the facts of this case, Section 4.214(a) of the UCC states in pertinent part that

> (a) [i]f a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item that is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not it is able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts.

TEX. BUS. & COM. CODE ANN. § 4.214(a). Customers who are victims of fraudulent transactions often pursue common law causes of action to avoid the bank's right of chargeback as provided by the code. Melissa Waite, *Check Fraud and the Common Law: At the Intersection of Negligence and the Uniform Commercial Code*, 54 B. C. L. Rev. 2205, 2224 (Nov. 2013). "[The UCC] is not clear as to whether and under what contexts common law claims should be allowed in check fraud scenarios because Articles 3 and 4 have no explicit preemption provision." ***Id***.

When construing a statute, we are to consider, among other things, the object to be obtained by the legislature and the circumstances under which the statute was enacted. TEX. GOV'T CODE ANN. § 311.023 (1), (2) (West 2013). The UCC contains a comprehensive and

carefully considered allocation of responsibility among parties to a banking relationship in Texas. *Sw. Bank v. Info. Support*, 149 S.W.3d 104, 107 (Tex. 2004). Chapter 4 of the UCC specifies duties and responsibilities for a bank in the actual check processing procedure. But, it is silent about the bank's communications with the customer during the check processing procedure. The Montana Supreme Court, in an opinion involving a similar fact pattern, determined that common law principles apply when a bank communicates with a depositor who has inquired about the check processing procedure. *See Valley Bank of Ronan v. Hughes*, 147 P.3d 185, 191 (Sup. Ct. Mont. 2006).

In that case, the customer alleged that the bank had made misrepresentations about the check settlement process. He then sued the bank claiming that it had inappropriately charged back his account after the dishonor of the deposited checks. The Montana Supreme Court reasoned that because such communications are not addressed with specificity by the UCC, common law and equitable principles supplement the UCC and govern the legal rights and responsibilities that applied to the bank's representations to the customer, upon which the customer allegedly relied. *Id*. The Montana Supreme Court thus held that common law principles apply to bank communications to a depositor inquiring about the processing of checks. *Id*. at 192.

We are mindful that a uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it. Tex. Gov't Code Ann. § 311.028 (West 2013). The UCC itself specifically describes fraud as a cause of action that can be used to supplement its provisions. Tex. Bus. & Com. Code Ann. § 1.103. We therefore agree with the Montana Supreme Court's holding in *Valley Bank of Ronan v. Hughes* that common law fraud principles apply to bank communications during the check processing procedure. Accordingly, the trial court erred in granting summary judgment on the Bank's affirmative defense of preemption as asserted against ADT's fraud claim. *See Fernandez*, 315 S.W.3d at 508. We sustain ADT's second issue.

## Common Law Fraud

In its third issue, ADT argues that the traditional summary judgment was improperly granted because there are conflicts in the evidence creating disputed issues of fact related to its common law fraud claim. ADT claims there are fact issues regarding the intention of the tellers

7

in making the representations and whether ADT relied on the Bank's representations. In its sixth issue, ADT contends that it produced more than a scintilla of evidence related to its fraud claim, thereby defeating the Bank's motion for a no evidence summary judgment on that claim. ADT claims the summary judgment evidence shows that false representations were made intentionally and without knowledge of the truth, and ADT reasonably relied on the representation.

## Elements of Fraud

A plaintiff, such as ADT, seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011).

## Material Misrepresentation

ADT claims that Bank employees Heather McDougald and Laura Hill made material misrepresentations or false statements respectively to Payne and Blaase regarding whether the counterfeit check had cleared. We first review ADT's summary judgment evidence concerning McDougald's representations to Payne. In her deposition testimony, which is part of the record before us, Payne recounted her March 1 conversation with McDougald:

Q. Got it. You spoke to Ms. McDougald?
A. Yes.
Q. And what did you ask her? What did she tell you?
A. I asked her, I said, Have you heard anything yet?
Q. What did she tell you?
A. She told me no.
Q. That's the question you asked all three of those times, right?
A. Yeah.
Q. And then at some point, did somebody tell you, Hey, it's okay?
A. I asked her when I was in. I made deposits on the 1st of March. I had three deposits that day, and so - - and that was a Monday, and I asked Heather, and she said, Let me look on the computer, and she told me then that the funds were there, and she said, it looks like they're good.
Q. Did she say anything other than that?
A. I don't remember.
Q. Tell me as close as you can precisely what she said. The funds were there?
A. I did ask her, I said, Then can I disburse the funds? And she said, Yes. That was the other thing.
Q. You asked her, Can I disburse the funds?
A. Yes.

Q. And then she said yes. And what else - - what else did she say besides yes to that question?
A. Nothing, that I can - -
Q. So the only thing that she said in response to your question, Can I disburse the funds, and she said yes?
A. Said yes.
Q. And that's all she said?
A. Yes, as far as my recollection, that's what she said.
Q. Okay, And do you now believe that she was in error when she said that?
A. I think she believed it, but evidently it wasn't correct.
Q. She obviously wasn't trying to deceive you in some way, was she?
A. No, I don't think she was trying to deceive me.

This evidence shows that McDougald told Payne "the funds were there." Then she said, "It looks like they are good." Payne further testified that McDougald told her that she could disburse the funds. The deposit agreement provides that, in accepting items for deposit, the Bank assumes no responsibilities beyond the exercise of ordinary care. Further, the agreement provides that all checks credited to an account are subject to receipt of the proceeds of final payment by the Bank. The Bank's policy is to make funds from the depositor's cash and check deposits available to the depositor on the first business day after the day it receives the deposit. Thus, under the deposit agreement and funds availability policy, each of these three statements made by McDougald to Payne were true. The funds were there, they were good, and ADT could immediately disburse the funds.

ADT's purported evidence of a misrepresentation by Hill to Blaase consists of testimony from Blaase's deposition as follows:

A. When I walked up to the - - to her at the teller box, I said, I want to make sure that - - I need to send a wire. How do I do it? Because I haven't done it before. So she pulled this form out and she says, Well, I need this information. And I said, Well, I think I have it all, but I want to make sure that this check has cleared. We've been told that it has, Jan had been told that it has. And she went to her computer screen, you know, maybe 10, 15 seconds, not long, and said yes, and so then I handed her the slip of paper that Trena had filled this information out, and Laura filled all this out and asked me to print my name, put my phone number and sign it, and she'd take care of it.

This testimony establishes only that Hill's answer to Blaase's query was based on what she saw on her computer screen. That screen would have shown the provisional credit that ADT had received when it deposited the counterfeit check pursuant to the deposit agreement and the Bank's funds availability policy. Hill had the same information that McDougald had seen on her screen the day before. The Bank's computer showed the availability of the funds and this was

9

reported to Payne and Blaase. For a fraud claim to survive, the company agent that makes the representation must have the requisite mental state; that is, as relevant here, she must know that the statement was false. *Landers v. Aurora Loan Servs., LLC*, 434 S.W.3d 291, 296 (Tex. App.—Texarkana 2014, no pet.). There is nothing in the record before us that shows either McDougald or Hill had any knowledge that the information they gave to Payne or Blaase was false.

**Knowing or Reckless Misrepresentation**

To establish fraud, ADT was required to produce evidence that McDougald and Hill knew their statements were false or made recklessly without knowledge of the truth. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex. 1998). A speaker acts recklessly if he makes representations "about any knowledge of the truth and as a positive assertion." *Id*. at 527. As shown in the paragraphs above, when they spoke to Payne and Blaase, McDougald and Hill focused on the availability of the funds to ADT, as reflected by the Bank's computerized records. Payne and Blaase, however, were attempting to determine if the counterfeit check had cleared. ADT's president and vice president interpreted the communication differently from the Bank's employees. Fraud requires proof of an affirmative misrepresentation, not simply a misunderstanding. *See Orion Ref. Corp. v. UOP*, 259 S.W.3d 749, 771-72 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *Mumphord v. First Victoria Nat'l Bank*, 605 S.W.2d 701, 704 (Tex. App.—Corpus Christi 1980, no writ).

Furthermore, the communication at issue is open to more than one interpretation and therefore ambiguous. The legal definition of ambiguity is "[d]oubtfulness or uncertainty of meaning or intention, as in a contractual term or statutory provision; indistinctness of signification, esp. by reason of doubleness of interpretation." BLACK'S LAW DICTIONARY 97 (10th ed. 2014). The ambiguous communication does not equate to knowing the representation was false or made without knowledge of its truth. Therefore, there is no evidence of this element of fraud in the record before us.

**Justifiable Reliance**

To prove fraud, ADT must show that it both actually and justifiably relied upon the alleged misrepresentation to suffer an injury. Blaase asserted that he was relying on what Hill viewed on her computer screen to determine that the check had cleared. The record shows that he had asked the Bank's vice president and branch manager in Gun Barrel City, Leland Pitts, on

five separate occasions whether the check had cleared. He was told each time by Pitts that it had not. He had never dealt with Hill, who was a teller at the Mabank branch of the Bank, regarding this deposit. To expect her to know the background of this transaction was not justifiable. Payne could not rely on what McDougald told her about the funds "being there" or "good" and that they could be disbursed to create a justifiable belief that the check had cleared.

Our supreme court has further stated that a person may not justifiably rely upon a representation if there are "red flags" indicating reliance is unjustified. In measuring justifiability, we must inquire whether, given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud, it is extremely unlikely that there is actual reliance on the plaintiff's part. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). Moreover, a person may not justifiably rely on a representation if there are "red flags" indicating such reliance is unwarranted. *Id*.

The red flags for ADT appeared in the first communication with Lopez and never stopped. Lopez identified himself as a chief financial officer of a Chinese company. Yet, his numbers in his communications with ADT were never consistent. He said his "stock broker" was sending "a payment of $105,000.00USD ($500,000.00USD)." He had his "account manager," Mr. Green Sound, send a check for $35,000.00. The check that was sent showed a numerical amount of $35,000.00 while the amount shown in writing was only $30,000.00.

Lopez initially said he needed "$98,000.00 for the purchase of Chinese home style furniture, Chinese home style entertainment, Chinese home decorations, and Chinese kitchen appliances." But then, he asked that only $30,000.00 be wired for the purchase of these items.

The name of the Chinese chief financial officer, Yang Hua Lopez, was unusual. "Lopez" is not of Chinese origin. Lopez said the money would be sent by his "stockbroker in America." The check, however, was sent from Canada by a "Mr. Green Sound," who identified himself as an "account manager." Further, the counterfeit check was drawn on the Bank of Montreal by a Canadian insurance company with the name of "AXA."

Lopez first told ADT that he wanted a house located in its city. But, when sent a list of prospective properties, he chose a house eighty miles away. He made this choice only one and a half hours after he had been presented a list of the properties by ADT.

Lopez never signed a buyer's representation agreement with ADT although he was asked on numerous occasions to do so. Further, he never signed an earnest money contract for the property he had selected. Finally, Lopez requested that the funds, which had been paid by a Canadian insurance company and drawn on a Canadian bank, be wired to a bank in Tokyo, Japan so that he could purchase furnishings in China for the Texas property.

ADT appeared to accept all of these implausible names, conflicting messages, inconsistent numbers, contradictory instructions, unusual circumstances, and absence of key documents at face value, rather than probing further into these red flags to determine if this was a legitimate transaction. A fraud plaintiff cannot recover if he blindly relies upon a misrepresentation, the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. *Field v. Mans*, 516 U.S. 59, 71, 116 S. Ct. 437, 444, 139 L. Ed. 2d 351 (1995). All of these red flags show that ADT's alleged reliance on the Bank employees' statements regarding the counterfeit check was unjustified. We hold ADT failed to establish the justifiable reliance element of its fraud cause of action. *Grant Thornton*, 314 S.W.3d at 923. The record indicates there is no evidence of a material misrepresentation by the Bank, a knowing or reckless misrepresentation by the Bank, or justifiable reliance on the Bank's representation. Accordingly, the trial court correctly granted a summary judgment in favor of the Bank on ADT's fraud claim. *See Merriman*, 407 S.W.3d at 248; *Exxon Corp.*, 348 S.W.3d at 217. We overrule ADT's third and sixth issues.

## OTHER CAUSES OF ACTION

In its fifth issue, ADT contends that the bank improperly charged back its provisional credit for the counterfeit check in the amount of $30,000.00 and the trial court erred in denying its alternative causes of action. ADT further asserts that the trial court erred in granting summary judgment in favor of the Bank on its counterclaim for ADT's breach of UCC warranties.

**Breach of Contract**

ADT alleged that the Bank's withdrawal of funds from ADT's account was a breach of the deposit agreement and the Bank breached its common law duty to perform. The relationship of a bank to a general depositor is contractual, that of debtor-creditor arising from the depository contract. *Trevino & Assocs. Mech., L.P. v. Frost Nat'l Bank*, 400 S.W.3d 139, 148 (Tex.

App.—Dallas 2013, no pet.). The laws of this state govern a deposit contract between a bank and a consumer account holder if the branch or separate office of the bank that accepts the deposit contract is located in Texas. TEX. BUS. & COM. CODE ANN. § 4.102(c). Under the laws of this state, the UCC regulates a bank's handling of deposits and collections for its customers. *Id*. §§ 4.101-.504. The relationship may also be governed in part by agreements between the bank and its customer. *Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n*, 462 S.W.3d 128, 133 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The UCC, in these relationships, contains a comprehensive and carefully considered allocation of responsibility among parties to banking relationships. *Sw. Bank*, 149 S.W.3d at 107; *Martin*, 29 S.W.3d at 91. Where the UCC applies, common law rules regarding breach of contract do not apply. *Roberts*, 167 S.W.3d at 624. Further, when the UCC applies, common law claims that conflict with the UCC are precluded. *See Contractors Source, Inc*., 462 S.W.3d at 138.

In a chargeback such as happened here, Section 4.214 of the UCC applies. TEX. BUS. & COM. CODE ANN. § 4.214(a). Any cause of action that ADT had for breach of contract was preempted by the UCC. *Roberts*, 167 S.W.3d at 624. When the Canadian check deposited by ADT was determined to be counterfeit, the Bank was authorized by the UCC to effectuate a chargeback. TEX. BUS. & COM. CODE ANN. § 4.214(a). The chargeback would have also been allowed by the deposit agreement. The trial court did not err by granting the Bank a summary judgment on ADT's breach of contract claim. *See Fernandez*, 315 S.W.3d at 508.

## Equitable Estoppel

ADT asserted that the Bank is estopped to deny that ADT was informed the check had cleared or was good. The doctrine of equitable estoppel requires (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted upon; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations. *Kenneco Energy, Inc.*, 962 S.W.2d at 515-16.

The first element of equitable estoppel required a false statement to ADT by McDougald or Hill. When McDougald and Hill respectively spoke to Payne and Blaase, they were focused on whether the funds were in ADT's account. The uncontroverted evidence is that the funds were in ADT's account due to the provisional credit Blaase had opted for. Neither McDougald

nor Hill made a false statement. Therefore, this defense fails. *See Merriman*, 407 S.W.3d at 248.

**Failure to Return Check**

In its petition, ADT complained that its claim against the maker of the check is precluded due to the Bank's failure to return the alleged counterfeit check. In its brief, ADT has not argued and analyzed its position on the Bank's failure to return the check. Further, it has not cited any authority to support its position. Rule 38 of the Rules of Appellate Procedure provides that a brief to the court of appeals shall contain, among other things, "a clear and concise argument for the contentions made, with appropriate citations to authorities in the record." TEX. R. APP. P. 38.1(i); *In re B.A.B.*, 124 S.W.3d 417, 420 (Tex. App.—Dallas 2004, no pet.). The failure to adequately brief an issue, either by failing to specifically argue and analyze one's position or provide citations to authorities, waives any error on appeal. *Id.* Therefore, ADT has waived any error regarding this cause of action.

**Promissory Estoppel**

ADT alleged that the Bank consented to inform ADT if the check was not good and was damaged when it relied on Bank employees' statements that the check was good. The requisites of promissory estoppel are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment. *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n.25 (Tex. 2002). If an alleged promise is part of a valid contract, the promisee cannot disregard the contract and sue for reliance damages under the doctrine of promissory estoppel. *BP Am. Prod. Co. v. Zaffirini*, 419 S.W.3d 485, 507 (Tex. App.—San Antonio 2013, pet. denied). Promissory estoppel is not applicable to a promise covered by a valid contract between the parties. *Id*.

As explained above, there was a valid contract between the Bank and ADT with regard to deposits and collections. Therefore, even if this contract was not preempted by the provisions of the UCC related to chargeback on provisional credits, a promissory estoppel cause of action would not have been available to ADT in this case. *See id*. The trial court did not err in granting the Bank's motion for summary judgment on ADT's claim for promissory estoppel. *See Fernandez*, 315 S.W.3d at 508.

14

## Money Had and Received

ADT alleged that the Bank wrongfully withdrew $30,000.00 from ADT's account and it would be unconscionable for the Bank to retain it. To recover in a cause of action for money had and received, all a plaintiff need show is that the defendant holds money that in equity and good conscience belongs to the plaintiff. *Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951). This cause of action "looks solely to the inquiry, whether the defendant holds money which belongs to the plaintiff." *Id.* at 687-88. Money had and received is a common law claim.[1] It is not listed as a cause of action that supplements the UCC. *See* TEX. BUS. & COM. CODE ANN. § 1.103(b). Furthermore, the Bank withdrew the $30,000.00 pursuant to Section 4.214 of the UCC, which gives the Bank the right to charge back the amount previously given for a dishonored item. TEX. BUS. & COM. CODE ANN. § 4.214. Therefore, the common law cause of action for money had and received has been supplanted by Chapter 4 of the UCC. The trial court properly granted summary judgment in favor of the Bank on ADT's claim for money had and received. *See Fernandez*, 315 S.W.3d at 508.

## Negligent Misrepresentation and Conversion

ADT alleged that the Bank's actions constituted negligent misrepresentation and conversion. Causes of action for negligent misrepresentation and conversion must be filed within two years from the date that they occur. If not, the claim is barred by the statute of limitations. TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (West Supp. 2014); *Tex. Am. Corp. v. Woodbridge Joint Venture*, 809 S.W.2d 299, 303 (Tex. App.—Fort Worth 1991, writ denied).

Here, the alleged negligent misrepresentation and conversion would have occurred in March 2010. ADT filed its first original petition against the Bank in September 2012. This was more than two years after ADT's cause of action would have accrued, and the negligent misrepresentation and conversion causes of action are therefore barred by the statute of limitations. The trial court did not err in granting summary judgment in favor of the Bank on ADT's negligent misrepresentation and conversion claims. *See Fernandez*, 315 S.W.3d at 508.

## Deceptive Trade Practices Act

Any cause of action filed under the DTPA must be brought within two years after discovery of the deceptive act complained of. TEX. BUS. & COM. CODE ANN. § 17.565 (West

---

[1] At common law, this cause of action was known as assumpsit. Michol O'Connor, O'CONNOR'S TEXAS CAUSES OF ACTION 131 (2015).

2011). Again, this cause of action would have accrued in March 2010 and suit was not filed until September 2012. ADT's DTPA cause of action is barred by the statute of limitations. *Id*. The trial court did not err in granting summary judgment in favor of the Bank on ADT's DTPA cause of action. *See Fernandez*, 315 S.W.3d at 508.

**The Bank's Counterclaim**

The Bank counterclaimed for ADT's breach of warranties under UCC Sections 3.416 and 4.207. *See* TEX. BUS. & COM. CODE ANN. §§ 3.416, 4.207 (West Supp. 2014). Pursuant to those sections, ADT warranted that it was entitled to enforce the check sent by Lopez and that the signature on the check was authentic. *Id*.

ADT argues that the warranties apply only to checks that are deposited, not those sent for collection. The evidence shows the check at issue was deposited. Additionally, the UCC does not make that distinction regarding warranties. The UCC provides that when a person transfers an instrument for consideration, he provides certain warranties. *Id*. An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument. TEX. BUS. & COM. CODE ANN. § 3.203 (West 2002).

ADT further asserts that Sections 3.416 and 4.207 apply to negotiable instruments and a counterfeit check is not negotiable, but only a facsimile of a negotiable instrument. Again, this is not an accurate distinction. Classification of an item as a negotiable instrument is based on form. TEX. BUS. & COM. CODE ANN. § 3.104(f) (West Supp. 2014). The evidence shows that the check at issue was counterfeit. Therefore, ADT breached its warranty that all signatures on the instrument are authentic and that it was entitled to enforce the check. *See* TEX. BUS. & COM. CODE ANN. §§ 3.416, 4.207. Accordingly, the trial court did not err in granting summary judgment in favor of the Bank on its counterclaim for breach of warranties under the UCC. *See* TEX. R. CIV. P. 166a(c).

**Summation**

ADT has not shown error in the trial court's determination that the Bank is entitled to summary judgment on each of ADT's alternative causes of action, its defense of equitable estoppel, or on the Bank's counterclaim. Accordingly, we overrule ADT's fifth issue.

In its first issue, ADT contends that the trial court erred in striking much of the deposition testimony of Janet Payne, Robert Blaase, Leland Pitts, and Heather McDougald. In response to the Bank's objection, the trial court struck all deposition testimony that was not specifically referenced in ADT's response to the Bank's motion for summary judgment. ADT argues that the depositions were not voluminous and, in light of today's technology, searching for words can be done electronically.

Rulings concerning the admission or exclusion of summary judgment evidence are reviewed under an abuse of discretion standard. ***Barraza v. Eureka Co***., 25 S.W.3d 225, 228 (Tex. App.—El Paso 2000, pet. denied). A trial court abuses its discretion if it acts without any reference to any guiding rules or principles. ***Downer v. Aquamarine Operators, Inc***., 701 S.W.2d 238, 241 (Tex. 1985).

A general reference to a voluminous summary judgment record is inadequate to meet the evidentiary burden in a summary judgment. ***Ramirez v. Colonial Freight Warehouse Co.***, 434 S.W.3d 244, 250 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). An appellant has a duty to show that the record supports its contentions. ***Blake v. Intco Invs. of Tex., Inc.***, 123 S.W.3d 521, 525 (Tex. App.—San Antonio 2003, no pet.). Here, ADT made reference to portions of each of the four depositions to support its position on the summary judgment. However, it attached each of the four depositions in its entirety. The trial court should not be compelled to sift through hundreds of pages of depositions to search for evidence supporting a summary judgment contestant's contentions. ***Guthrie v. Suiter***, 934 S.W.2d 820, 826 (Tex. App.—Houston [1st Dist.] 1996, no writ.). Therefore, the trial court did not abuse its discretion by refusing to consider the remainder of the depositions of Payne, Blaase, McDougald, and Pitts that were not specifically cited to it in ADT's summary judgment response. We overrule ADT's first issue.

## ATTORNEY'S FEES

Finally, in its fourth issue, ADT challenges the trial court's award of attorney's fees to the Bank on its counterclaim. ADT contends that attorney's fees are not warranted because no actual damages were awarded to the Bank, the Bank presented no claims for affirmative relief, and the services of the Bank's attorneys were only defensive to ADT's claim.

The issue of whether a party is entitled to recover attorney's fees is a question of law for the court to determine. *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 23 (Tex. App.—Tyler 2000, pet. denied). A party may recover attorney's fees only as provided by contract or statute. *Woodhaven Partners, LTD v. Shamoun & Norman, L.L.P.*, 422 S.W.3d 821, 837 (Tex. App.—Dallas 2014, no pet.). Parties are free to contract for a fee recovery standard either more or less strict than Chapter 38 of the Civil Practice and Remedies Code. *Intercontinental Group P'ship v. K.B. Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). When parties include an attorney's fee provision in a contract, the language of the contract controls over the language of the statute. *Peterson Group, Inc. v. PLTQ Lotus Group, L.P.*, 417 S.W.3d 46, 88 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (Keyes, J., dissenting). Whether a party is a prevailing party is based on success on the merits, not the award or denial of damages. *Robbins v. Capozzi*, 100 S.W.3d 18, 27 (Tex. App.—Tyler 2002, no pet.). A prevailing party is one who is vindicated by the trial court's judgment. *Id*.

The deposit agreement between the Bank and ADT included the following clause:

> You also agree to pay all attorney's fees, costs and expenses that financial institution may incur as a result of any claim or action made against financial institution by you or on your behalf related to your account where financial institution is found not to be liable for such claim.

The Bank sought attorney's fees pursuant to this clause in the deposit agreement. The parties' agreement specifically stated that the Bank would be entitled to its attorney's fees if it was found not to be liable on any claim made by ADT. Although the Bank received no damages or affirmative relief, it was the prevailing party in this litigation due to the fact that it was found not to be liable on the claims made against it by ADT. *Id*. The trial court properly awarded the Bank its attorney's fees. We overrule ADT's fourth issue.

<u>**DISPOSITION**</u>

We *affirm* the trial court's judgment.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered September 16, 2015.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*
(PUBLISH)

18

2015 WL 5439686
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Appeals of Texas,
Tyler.

American Dream Team, Inc., Appellant
v.
Citizens State Bank, Appellee

NO. 12–14–00117–CV | Opinion delivered
September 16, 2015

**Synopsis**
**Background:** Accountholder brought action against bank for negligent misrepresentation and conversion, violations of the Deceptive Trade Practices Act (DTPA), common law fraud, breach of contract, equitable estoppel, failure to return check, money had and received, and promissory estoppel. The 173rd Judicial District Court, Henderson County, Dan Moore, J., granted summary judgment for bank and awarded attorney fees. Accountholder appealed.

**Holdings:** The Court of Appeals, James T. Worthen, C.J., held that:

[1] Uniform Commercial Code (UCC) does not preempt common law fraud principles as applied to bank communications during the check processing procedure;

[2] bank teller's statement that a check had "cleared" was not fraudulent;

[3] any reliance on bank employees' statements to conclude the check had cleared was not reasonable; and

[4] any common law cause of action for money had and received was supplanted by the UCC.

Affirmed.

West Headnotes (41)

[1] **Judgment**


Both traditional and no evidence summary judgment claims can be raised in a single motion so long as the motion sufficiently segregates the traditional claims from the no evidence claims.

Cases that cite this headnote

[2] **Appeal and Error**


When a party moves for summary judgment on both traditional and no evidence grounds, the Court of Appeals first addresses the no evidence grounds.

Cases that cite this headnote

[3] **Fraud**


Principles of law and equity, including fraud and misrepresentation, supplement the provisions of the Uniform Commercial Code (UCC) unless displaced by particular UCC provisions. Tex. Bus. & C. Code § 1.103(b).

Cases that cite this headnote

[4] **Common Law**


A common law cause of action can continue in a commercial law context in Texas when it does not conflict with provisions of the Uniform Commercial Code (UCC). Tex. Bus. & C. Code

§ 1.103.

Cases that cite this headnote

---

**[5]** **Statutes**



A uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it.

Cases that cite this headnote

---

**[6]** **Fraud**



The Uniform Commercial Code (UCC) does not preempt common law fraud principles as applied to bank communications during the check processing procedure. Tex. Bus. & C. Code § 1.103.

Cases that cite this headnote

---

**[7]** **Fraud**



A plaintiff seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation.

Cases that cite this headnote

---

**[8]** **Banks and Banking**



Bank employee's statements to accountholder's representative that the funds from a recently deposited check drawn on a foreign bank were "there," that it "looks like they are good," and that accountholder could disburse the funds to another foreign bank account were true, and thus the statements did not satisfy the "material misrepresentation" element of common law fraud, even though the bank later determined that the check was counterfeit and subject to chargeback, since the bank employee's statements were consistent with the bank's policy to make funds from deposits available before the credit to the accountholder became final.

Cases that cite this headnote

---

**[9]** **Banks and Banking**



Bank teller's statement that a check with funds the accountholder wanted to use for a wire transfer had "cleared" was not made with knowledge of the statement's falsity, as required to subject the bank to liability for common law fraud, where teller answered accountholder's representative's query based on what teller saw on her computer screen.

Cases that cite this headnote

---

**[10]** **Fraud**



A speaker acts recklessly, as would support fraud liability, if he makes representations about any knowledge of the truth and as a positive assertion.

Cases that cite this headnote

---

Cases that cite this headnote

**[11]** **Fraud**



Fraud requires proof of an affirmative misrepresentation, not simply a misunderstanding.

Cases that cite this headnote

**[12]** **Fraud**



It was not justifiable for accountholder's representative to conclude that a recently deposited $30,000 check drawn on a foreign bank had actually cleared in reliance on a bank teller's statement that the check cleared and another bank employee's statements that the funds were "there" and that it "looks like they are good," and thus those statements did not subject the bank to liability for common law fraud, where the representative had asked the bank's vice president on five separate occasions whether the check had cleared and he was told each time that it had not, and the check was part of a suspicious transaction with a person who claimed to be a Chinese business executive and who claimed to need the Texas-based accountholder to wire the proceeds of the check to Japan to pay for home furnishings.

Cases that cite this headnote

**[13]** **Fraud**



In measuring justifiability of reliance supporting fraud, courts must inquire whether, given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud, it is extremely unlikely that there is actual reliance on the plaintiff's part.

**[14]** **Fraud**



A person may not justifiably rely on a representation, as required for fraud liability, if there are "red flags" indicating such reliance is unwarranted.

Cases that cite this headnote

**[15]** **Fraud**



A fraud plaintiff can not recover if he blindly relies upon a misrepresentation, the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.

Cases that cite this headnote

**[16]** **Banks and Banking**



The relationship of a bank to a general depositor is contractual, that of debtor-creditor arising from the depository contract.

Cases that cite this headnote

**[17]** **Banks and Banking**



Although the Uniform Commercial Code (UCC) regulates a bank's handling of deposits and collections for its customers, the relationship may also be governed in part by agreements between the bank and its customer. Tex. Bus. &

C. Code § 4.101 et seq.

Cases that cite this headnote

**[18]** **Contracts**



Where the Uniform Commercial Code (UCC) applies, common law rules regarding breach of contract do not apply, and common law claims that conflict with the UCC are precluded. Tex. Bus. & C. Code § 4.101 et seq.

Cases that cite this headnote

**[19]** **Banks and Banking**



Any cause of action that accountholder had against bank for breach of deposit agreement, for bank's act of making a chargeback to recover funds from a counterfeit check deposited in accountholder's account, was preempted by the Uniform Commercial Code (UCC) provision giving banks the right to charge back the amount previously given for a dishonored item. Tex. Bus. & C. Code § 4.214(a).

Cases that cite this headnote

**[20]** **Estoppel**



Doctrine of equitable estoppel requires (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted upon; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations.

Cases that cite this headnote

**[21]** **Estoppel**



Bank teller's statement that a check with funds the accountholder wanted to use for a wire transfer had "cleared" was not a "false representation or concealment of material facts," as required for equitable estoppel, where the account had been provisionally credited with funds from the deposit, and the issue of whether the funds were in the account was what the teller was focused on.

Cases that cite this headnote

**[22]** **Estoppel**



Bank employee's statements to accountholder's representative that the funds from a recently deposited check drawn on a foreign bank were "there," that it "looks like they are good," and that accountholder could disburse the funds to another foreign bank account were true, and thus the statements did not satisfy the "false representation or concealment of material facts" element of equitable estoppel, even though the bank later determined that the check was counterfeit and subject to chargeback, since the bank employee's statements were consistent with the bank's policy to make funds from deposits available before the credit to the accountholder became final.

Cases that cite this headnote

**[23]** **Appeal and Error**



Accountholder's failure to argue and analyze its position on appeal or cite any supporting authority waived any error regarding trial court's summary judgment in bank's favor on

accountholder's cause of action for failing to return a check that the bank determined was counterfeit. Tex. R. App. P. 38.1(i).

Cases that cite this headnote

**[24]** **Implied and Constructive Contracts**


The requisites of promissory estoppel are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment.

Cases that cite this headnote

**[25]** **Implied and Constructive Contracts**


If an alleged promise is part of a valid contract, the promisee cannot disregard the contract and sue for reliance damages under the doctrine of promissory estoppel.

Cases that cite this headnote

**[26]** **Implied and Constructive Contracts**


Even if bank consented to inform accountholder if a suspicious check deposited in the account was not good, that promise did not give rise to promissory estoppel, where there was a valid contract between accountholder and bank with regard to deposits and collections.

Cases that cite this headnote

**[27]** **Implied and Constructive Contracts**


To recover in a cause of action for money had and received, all a plaintiff need show is that the defendant holds money that in equity and good conscience belongs to the plaintiff.

Cases that cite this headnote

**[28]** **Implied and Constructive Contracts**


Money had and received is a common law claim.

Cases that cite this headnote

**[29]** **Banks and Banking**


Any common law cause of action against bank for money had and received, based on bank's chargeback of funds from a deposit of a counterfeit check, was supplanted by the Uniform Commercial Code (UCC) provision giving banks the right to charge back the amount previously given for a dishonored item. Tex. Bus. & C. Code §§ 1.103(b), 4.214.

Cases that cite this headnote

**[30]** **Limitation of Actions**


Accountholder's causes of action against bank for alleged negligent misrepresentation and conversion would have accrued, thus starting the two-year limitations period, when the alleged negligent misrepresentation and conversion would have occurred. Tex. Civ. Prac. & Rem. Code Ann. § 16.003.

Cases that cite this headnote

**[31]     Limitation of Actions**



Any Deceptive Trade Practices Act (DTPA) cause of action against bank, related to bank's chargeback of funds from a deposit of a counterfeit check, would have accrued upon discovery of the deceptive act complained of. Tex. Bus. & C. Code § 17.565.

Cases that cite this headnote

**[32]     Banks and Banking**



Under the Uniform Commercial Code (UCC) provisions stating that when a person transfers an instrument for consideration, he provides certain warranties, the UCC does not make a distinction between checks that are deposited and those that are sent for collection. Tex. Bus. & C. Code §§ 3.203, 3.416, 4.207.

Cases that cite this headnote

**[33]     Banks and Banking**



Counterfeit check was a "negotiable instrument" governed by the statute providing that upon depositing a check a bank customer warrants that all signatures on the instrument are authentic and that it is entitled to enforce the check. Tex. Bus. & C. Code §§ 3.104(f), 3.416, 4.207.

Cases that cite this headnote

**[34]     Appeal and Error**



Rulings concerning the admission or exclusion of summary judgment evidence are reviewed under an abuse of discretion standard, and a trial court abuses its discretion if it acts without any reference to any guiding rules or principles.

Cases that cite this headnote

**[35]     Judgment**



A general reference to a voluminous summary judgment record is inadequate to meet the evidentiary burden in a summary judgment.

Cases that cite this headnote

**[36]     Appeal and Error**



An appellant has a duty to show that the record supports its contentions.

Cases that cite this headnote

**[37]     Appeal and Error**



Trial court acted within its discretion in striking the portions of four voluminous depositions that were not specifically referenced in plaintiff's response to defendant's motion for summary judgment, where plaintiff attached the entire depositions to the response.

Cases that cite this headnote

**[38]     Costs**





The issue of whether a party is entitled to recover attorney fees is a question of law for the court to determine.

Cases that cite this headnote

**[39]    Costs**



A party may recover attorney fees only as provided by contract or statute, and parties are free to contract for a fee recovery standard either more or less strict than provided by the Civil Practice and Remedies Code.

Cases that cite this headnote

**[40]    Costs**



Under an attorney fee provision in a contract, whether a party is a prevailing party is based on success on the merits, not the award or denial of damages.

Cases that cite this headnote

**[41]    Costs**

Under a contractual attorney fee clause providing that accountholder agreed to pay bank's attorney fees if bank was found not to be liable for "any claim or action" made against the bank by the accountholder, bank was entitled to recover attorney fees upon being found not to be liable on any of the claims made against it by accountholder, even though the bank received no damages or affirmative relief.

Cases that cite this headnote

APPEAL FROM THE 173RD JUDICIAL DISTRICT COURT, HENDERSON COUNTY, TEXAS. DAN MOORE, JUDGE.

**Attorneys and Law Firms**

E. John Emmett, for Appellant.

Scott A. Ritheson, for Appellee.

Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.

*OPINION*

JAMES T. WORTHEN, Chief Justice

**\*1** American Dream Team, Inc. (ADT) filed suit against Citizens State Bank alleging the Bank had improperly charged back $30,000.00 against its account for a provisional credit extended on a counterfeit check. The trial court granted the Bank's motion for traditional and no evidence summary judgment, rendering a take nothing judgment on all of ADT's claims, and awarding attorney's fees to the Bank. In six issues, ADT contends the trial court reversibly erred. We affirm.

*BACKGROUND*

ADT is a real estate brokerage firm specializing in selling properties in the Cedar Creek Lake area of Henderson County, Texas. On January 23, 2010, it received the following system wide email sent by the marketer Point2 Real Estate:

23–Jan–2010

Prospect Email

You are receiving this email because Mr. Yang Hua Lopez has emailed you from your website.

Email: yanghl@informaticos.com

Dear Sir/Madam, I am Mr. Yang Hua Lopez currently

the Chief Financial Officer (CFO) Hangzhou Iron & Steel Group Company (HISGC) Website: http://www.hazsteel.com I am retiring soon will be relocating to Texas for Good, after searching the Internet for a reliable real estate agent I found your firm have decided to choose your firm to buy my permanent home. The home will be a cash buy and I will fly to your city for viewing the property but before that I would like my stock broker in America to send the money to your firm via a lawyer/solicitor to keep in a trust account upon arrival. I need a 4 bed rooms/5 bed room's home of $300,000.00USD - $1,200,000.00USD In nice neighborhood in your city and state. Email is better than telephone due to my accent and english. Regards, Mr. Yang Hua Lopez Chief Financial Officer, Email; yanghl@informaticos.com

Manage Prospect—Mr. Yang Hua Lopez

The following day, Trena Davis, a real estate agent with ADT, responded to Lopez by email stating that she would be happy to assist him in his home search. Upon his request, she sent him more than ten prospective properties meeting his stated requirements. Within an hour and a half, Lopez chose what he described as his "dream home" in Lewisville, Texas, more than eighty miles away from Cedar Creek Lake. Davis then sent Lopez a buyer's representation agreement, which she requested he sign and return to her. On January 27, Lopez sent Davis the following email:

Dear Trena,

I would like to inform you that my stock broker has sent you a payment of $105,000.00USD ($500,000.00USD) will be down payment of the property the rest will be completed upon my arrival and ($98,000.00USD) will be for the purchacse [sic] of Chinese home style furniture, Chinese style home entertainment, Chinese home decoration and Chinese kitchen appliance in China.

Please update me once you receive the payment.

Regards,

Mr. Yang Hua Lopez

Chief Financial Officer

Hangzhou Iron & Steel Group Company

Banshan County, Gongshu Dct,

Hangzhou Zhejiang 310022 China.

Tel: +86 10868 99249

Email: yanghua@ejecutivos.com

Website: http://www.hazsteel.com

On February 8, Davis emailed Lopez that she had not received the funds that had purportedly been sent January 27. Nor had she received the buyer's representation agreement from Lopez. In response, Lopez sent Davis the following email:

*2 From: yanghl@informaticos.com

Sent: Wednesday, February 10, 2010 8:13 AM

To: trena.davis@coldwellbankeradr.com

Subject: Dear Trena (update) Dear Trena

I would like to inform you that my stock broker firm has sent you a new payment of $35,000 via UPS ($5000.00USD) will be the down payment of the property the balance will be completed upon my arrival and ($30,000.00USD) will be for the purchacse [sic] of Chinese home style furniture, Chinese home style entertainment, Chinese home decoration and Chinese kitchen appliance in China.

You will receive it today via ups, update me once you receive it, have a nice day.

Regards,

Mr. Yang Hua Lopez

Chief Financial Officer.

On the same day, ADT received a check from a "Mr. Green Sound," identifying himself as Mr. Lopez's account manager. The check had two different amounts on its face. In numerals, it stated "$35,000.00USD," and in writing, it stated "THIRTY THOUSAND AND 00/100 U.S. DOLLARS." The check's drawer was AXA Insurance Company of Canada with the payer bank being the Bank of Montreal in Toronto, Ontario.

On February 11, ADT deposited the check into its escrow account at the Bank. The deposit slip was filled out by Jan Payne, ADT's president, in the amount of $35,000.00. ADT's vice president, Robert Blaase, physically made the deposit at the Bank's Seven Points branch. He was told by the branch manager, Leland Pitts, and a Bank employee, Heather McDougald, that because the check was drawn on a foreign bank, it could take between one and two months for the funds to be collected. At the time of their

meeting with Blaase while he was making this deposit, McDougald prepared a "foreign check transmittal form." It showed that following Blaase's instructions, ADT was given a provisional credit for the deposited check, pending collection. Blaase had been given a second option to send the check for collection with a minimum $75.00 fee plus possible additional fees from the paying bank, the Bank of Montreal. Taking the second option would have meant that ADT would not receive the provisional credit. But because Blaase chose the option to receive the provisional credit, the funds were immediately available for ADT's use under its deposit and related agreements with the Bank.

On March 1, Payne was told by McDougald, after she had looked on her computer, that "the funds were there" and "it looks like they're good." On March 2, Blaase told Bank teller Laura Hill at the Bank's Mabank branch that he wanted to wire $30,000.00 to a bank in Japan. Before sending the wire, he told Hill that he wanted to make sure that the AXA Insurance Company check had cleared. He testified that she looked at her computer screen and said that it had cleared. The money was wired to Tokyo that day.

On March 15, the Bank and ADT were notified the check was counterfeit. Attempts were made to recover the $30,000.00 wired to the Tokyo bank, but to no avail. The Bank then made a chargeback against ADT's escrow account for $30,000.00.

ADT later filed suit against the Bank to recover the $30,000.00 chargeback based on the following legal theories:

**\*3** 1. Negligent misrepresentation and conversion;

2. Violations of the Deceptive Trade Practices Act (DTPA);

3. Common law fraud;

4. Breach of contract (the deposit agreement), equitable estoppel, and failure to return check;

5. Money had and received; and

6. Promissory estoppel.

The Bank counterclaimed against ADT for its breach of transfer warranties on the counterfeit check and for its attorney's fees pursuant to the deposit agreement. The Bank filed a motion for traditional and no evidence summary judgment asserting that certain claims are barred by limitations, that ADT's fraud claim is preempted by the Uniform Commercial Code (UCC), and that there is no evidence to support ADT's common law causes of action. The Bank also moved for summary judgment on its counterclaim for breach of warranties under the UCC and for attorney's fees. The court rendered judgment that ADT take nothing on its claims against the Bank and awarded the Bank $72,938.00 in attorney's fees against ADT. This appeal followed.

### *STANDARD OF REVIEW*

[1] [2]Both traditional and no evidence summary judgment claims can be raised in a single motion so long as the motion sufficiently segregates the traditional claims from the no evidence claims. *Gonzalez v. VATR Const. LLC*, 418 S.W.3d 777, 782 (Tex.App.–Dallas 2013, no pet.). When a party moves for summary judgment on both traditional and no evidence grounds, we first address the no evidence grounds. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex.2013). A no evidence challenge will be sustained when

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Id.* The motion must specifically state the elements for which there is no evidence. *Salazar v. Ramos*, 361 S.W.3d 739, 745 (Tex.App.–El Paso 2012, pet. denied).

A party moving for traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). To determine if there is a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). A defendant who conclusively negates at least one of the essential elements of the cause of action or conclusively establishes an affirmative defense is entitled to summary judgment. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex.2010). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to

the plaintiff to present evidence raising a genuine issue of material fact. *Simulis, L.L.C. v. Gen. Elec. Capital Corp.*, 439 S.W.3d 571, 575 (Tex.App.–Houston [14th Dist.] 2014, no pet.).

### CHAPTER 4 PREEMPTION

**\*4** In its second issue, ADT contends that the trial court erred in granting summary judgment on the Bank's preemption claim. ADT asserts that its fraud claim, which was based on the statements made by the Bank's two employees during the check settlement process, was not preempted by the Uniform Commercial Code.

[3] [4]Chapter 4 of the UCC establishes the rights and duties between banks and their customers regarding deposits and collections. TEX. BUS. & COM. CODE ANN. §§ 4.101–.504 (West 2002 & Supp.2014); *Am. Airlines Emps. Fed. Credit Union v. Martin*, 29 S.W.3d 86, 91 (Tex.2000). Whether Chapter 4 applies is a question of law, which we review de novo. *Id.* To the extent they do not conflict with the UCC's provisions, common law principles complement the UCC. *Plano Lincoln Mercury, Inc. v. Roberts*, 167 S.W.3d 616, 624 (Tex.App.–Dallas 2005, no pet.). Principles of law and equity, including fraud and misrepresentation, supplement the provisions of the UCC unless displaced by particular UCC provisions. *See* TEX. BUS. & COM. CODE ANN. § 1.103(b) (West 2009). Additionally, Official Comment 2, Section 1.103 provides further guidance as follows:

> The Uniform Commercial Code was drafted against the backdrop of existing bodies of law, including the common law and equity, and relies on those bodies of law to supplement it [sic] provisions in many important ways. At the same time, the Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise.

TEX. BUS. & COM. CODE ANN. § 1.103 cmt. 2. Thus, a common law cause of action can continue in a commercial law context in Texas when it does not conflict with provisions of the UCC. *See Bryan v. Citizens Nat'l Bank in Abilene*, 628 S.W.2d 761, 764 (Tex.1982).

Relevant to the facts of this case, Section 4.214(a) of the UCC states in pertinent part that

> (a) [i]f a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item that is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not it is able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts.

TEX. BUS. & COM. CODE ANN. § 4.214(a). Customers who are victims of fraudulent transactions often pursue common law causes of action to avoid the bank's right of chargeback as provided by the code. Melissa Waite, *Check Fraud and the Common Law: At the Intersection of Negligence and the Uniform Commercial Code*, 54 B.C.L.Rev. 2205, 2224 (Nov.2013). "[The UCC] is not clear as to whether and under what contexts common law claims should be allowed in check fraud scenarios because Articles 3 and 4 have no explicit preemption provision." *Id.*

**\*5** When construing a statute, we are to consider, among other things, the object to be obtained by the legislature and the circumstances under which the statute wasenacted. TEX. GOV'T CODE ANN. § 311.023(1), (2) (West 2013). The UCC contains a comprehensive and carefully considered allocation of responsibility among parties to a banking relationship in Texas. *Sw. Bank v. Info. Support*, 149 S.W.3d 104, 107 (Tex.2004). Chapter

4 of the UCC specifies duties and responsibilities for a bank in the actual check processing procedure. But, it is silent about the bank's communications with the customer during the check processing procedure. The Montana Supreme Court, in an opinion involving a similar fact pattern, determined that common law principles apply when a bank communicates with a depositor who has inquired about the check processing procedure. *See Valley Bank of Ronan v. Hughes*, 334 Mont. 335, 147 P.3d 185, 191 (2006).

In that case, the customer alleged that the bank had made misrepresentations about the check settlement process. He then sued the bank claiming that it had inappropriately charged back his account after the dishonor of the deposited checks. The Montana Supreme Court reasoned that because such communications are not addressed with specificity by the UCC, common law and equitable principles supplement the UCC and govern the legal rights and responsibilities that applied to the bank's representations to the customer, upon which the customer allegedly relied. *Id.* The Montana Supreme Court thus held that common law principles apply to bank communications to a depositor inquiring about the processing of checks. *Id.* at 192.

[5] [6]We are mindful that a uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it. TEX. GOV'T CODE ANN. § 311.028 (West 2013). The UCC itself specifically describes fraud as a cause of action that can be used to supplement its provisions. TEX. BUS. & COM. CODE ANN. § 1.103. We therefore agree with the Montana Supreme Court's holding in *Valley Bank of Ronan v. Hughes* that common law fraud principles apply to bank communications during the check processing procedure. Accordingly, the trial court erred in granting summary judgment on the Bank's affirmative defense of preemption as asserted against ADT's fraud claim. *See Fernandez*, 315 S.W.3d at 508. We sustain ADT's second issue.

## COMMON LAW FRAUD

In its third issue, ADT argues that the traditional summary judgment was improperly granted because there are conflicts in the evidence creating disputed issues of fact related to its common law fraud claim. ADT claims there are fact issues regarding the intention of the tellers in making the representations and whether ADT relied on the Bank's representations. In its sixth issue, ADT contends that it produced more than a scintilla of evidence

related to its fraud claim, thereby defeating the Bank's motion for a no evidence summary judgment on that claim. ADT claims the summary judgment evidence shows that false representations were made intentionally and without knowledge of the truth, and ADT reasonably relied on the representation.

### Elements of Fraud

[7]A plaintiff, such as ADT, seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex.2011).

### Material Misrepresentation

*6 ADT claims that Bank employees Heather McDougald and Laura Hill made material misrepresentations or false statements respectively to Payne and Blaase regarding whether the counterfeit check had cleared. We first review ADT's summary judgment evidence concerning McDougald's representations to Payne. In her deposition testimony, which is part of the record before us, Payne recounted her March 1 conversation with McDougald:

Q. Got it. You spoke to Ms. McDougald?

A. Yes.

Q. And what did you ask her? What did she tell you?

A. I asked her, I said, Have you heard anything yet?

Q. What did she tell you?

A. She told me no.

Q. That's the question you asked all three of those times, right?

A. Yeah.

Q. And then at some point, did somebody tell you, Hey, it's okay?

A. I asked her when I was in. I made deposits on the 1st of March. I had three deposits that day, and so—

and that was a Monday, and I asked Heather, and she said, Let me look on the computer, and she told me then that the funds were there, and she said, it looks like they're good.

Q. Did she say anything other than that?

A. I don't remember.

Q. Tell me as close as you can precisely what she said. The funds were there?

A. I did ask her, I said, Then can I disburse the funds? And she said, Yes. That was the other thing.

Q. You asked her, Can I disburse the funds?

A. Yes.

Q. And then she said yes. And what else—what else did she say besides yes to that question?

A. Nothing, that I can—

Q. So the only thing that she said in response to your question, Can I disburse the funds, and she said yes?

A. Said yes.

Q. And that's all she said?

A. Yes, as far as my recollection, that's what she said.

Q. Okay, And do you now believe that she was in error when she said that?

A. I think she believed it, but evidently it wasn't correct.

Q. She obviously wasn't trying to deceive you in some way, was she?

A. No, I don't think she was trying to deceive me.

[8]This evidence shows that McDougald told Payne "the funds were there." Then she said, "It looks like they are good." Payne further testified that McDougald told her that she could disburse the funds. The deposit agreement provides that, in accepting items for deposit, the Bank assumes no responsibilities beyond the exercise of ordinary care. Further, the agreement provides that all checks credited to an account are subject to receipt of the proceeds of final payment by the Bank. The Bank's policy is to make funds from the depositor's cash and check deposits available to the depositor on the first business day after the day it receives the deposit. Thus, under the deposit agreement and funds availability policy, each of these three statements made by McDougald to Payne were true. The funds were there, they were good, and ADT could immediately disburse the funds.

ADT's purported evidence of a misrepresentation by Hill to Blaase consists of testimony from Blaase's deposition as follows:

> A. When I walked up to the—to her at the teller box, I said, I want to make sure that—I need to send a wire. How do I do it? Because I haven't done it before. So she pulled this form out and she says, Well, I need this information. And I said, Well, I think I have it all, but I want to make sure that this check has cleared. We've been told that it has, Jan had been told that it has. And she went to her computer screen, you know, maybe 10, 15 seconds, not long, and said yes, and so then I handed her the slip of paper that Trena had filled this information out, and Laura filled all this out and asked me to print my name, put my phone number and sign it, and she'd take care of it.

**\*7** [9]This testimony establishes only that Hill's answer to Blaase's query was based on what she saw on her computer screen. That screen would have shown the provisional credit that ADT had received when it deposited the counterfeit check pursuant to the deposit agreement and the Bank's funds availability policy. Hill had the same information that McDougald had seen on her screen the day before. The Bank's computer showed the availability of the funds and this was reported to Payne and Blaase. For a fraud claim to survive, the company agent that makes the representation must have the requisite mental state; that is, as relevant here, she must know that the statement was false. *Landers v. Aurora Loan Servs., LLC*, 434 S.W.3d 291, 296 (Tex.App.–Texarkana 2014, no pet.). There is nothing in the record before us that shows either McDougald or Hill had any knowledge that the information they gave to Payne or Blaase was false.

***Knowing or Reckless Misrepresentation***

[10] [11]To establish fraud, ADT was required to produce evidence that McDougald and Hill knew their statements were false or made recklessly without knowledge of the truth. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex.1998). A speaker acts recklessly if he makes representations "about any knowledge of the truth and as a positive assertion." *Id.* at 527. As shown in the paragraphs above, when they spoke to Payne and Blaase, McDougald and Hill focused on the availability of the funds to ADT, as reflected by the Bank's computerized records. Payne and Blaase, however, were attempting to determine if the counterfeit check had cleared. ADT's president and vice president interpreted the communication differently from the Bank's employees. Fraud requires proof of an affirmative misrepresentation, not simply a misunderstanding. *See Orion Ref. Corp. v. UOP*, 259 S.W.3d 749, 771–72 (Tex.App.–Houston [1st Dist.] 2007, pet. denied); *Mumphord v. First Victoria Nat'l Bank,* 605 S.W.2d 701, 704 (Tex.Civ.App.–Corpus Christi 1980, no writ).

Furthermore, the communication at issue is open to more than one interpretation and therefore ambiguous. The legal definition of ambiguity is "[d]oubtfulness or uncertainty of meaning or intention, as in a contractual term or statutory provision; indistinctness of signification, esp. by reason of doubleness of interpretation." BLACK'S LAW DICTIONARY 97 (10th ed.2014). The ambiguous communication does not equate to knowing the representation was false or made without knowledge of its truth. Therefore, there is no evidence of this element of fraud in the record before us.

### Justifiable Reliance

[12]To prove fraud, ADT must show that it both actually and justifiably relied upon the alleged misrepresentation to suffer an injury. Blaase asserted that he was relying on what Hill viewed on her computer screen to determine that the check had cleared. The record shows that he had asked the Bank's vice president and branch manager in Gun Barrel City, Leland Pitts, on five separate occasions whether the check had cleared. He was told each time by Pitts that it had not. He had never dealt with Hill, who was a teller at the Mabank branch of the Bank, regarding this deposit. To expect her to know the background of this transaction was not justifiable. Payne could not rely on what McDougald told her about the funds "being there" or "good" and that they could be disbursed to create a justifiable belief that the check had cleared.

[13] [14]Our supreme court has further stated that a person may not justifiably rely upon a representation if there are "red flags" indicating reliance is unjustified. In measuring justifiability, we must inquire whether, given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud, it is extremely unlikely that there is actual reliance on the plaintiff's part. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex.2010). Moreover, a person may not justifiably rely on a representation if there are "red flags" indicating such reliance is unwarranted. *Id.*

**\*8** The red flags for ADT appeared in the first communication with Lopez and never stopped. Lopez identified himself as a chief financial officer of a Chinese company. Yet, his numbers in his communications with ADT were never consistent. He said his "stock broker" was sending "a payment of $105,000.00USD ($500,000.00USD)." He had his "account manager," Mr. Green Sound, send a check for $35,000.00. The check that was sent showed a numerical amount of $35,000.00 while the amount shown in writing was only $30,000.00.

Lopez initially said he needed "$98,000.00 for the purchase of Chinese home style furniture, Chinese home style entertainment, Chinese home decorations, and Chinese kitchen appliances." But then, he asked that only $30,000.00 be wired for the purchase of these items.

The name of the Chinese chief financial officer, Yang Hua Lopez, was unusual. "Lopez" is not of Chinese origin. Lopez said the money would be sent by his "stockbroker in America." The check, however, was sent from Canada by a "Mr. Green Sound," who identified himself as an "account manager." Further, the counterfeit check was drawn on the Bank of Montreal by a Canadian insurance company with the name of "AXA."

Lopez first told ADT that he wanted a house located in its city. But, when sent a list of prospective properties, he chose a house eighty miles away. He made this choice only one and a half hours after he had been presented a list of the properties by ADT.

Lopez never signed a buyer's representation agreement with ADT although he was asked on numerous occasions to do so. Further, he never signed an earnest money contract for the property he had selected. Finally, Lopez requested that the funds, which had been paid by a Canadian insurance company and drawn on a Canadian bank, be wired to a bank in Tokyo, Japan so that he could purchase furnishings in China for the Texas property.

[15]ADT appeared to accept all of these implausible names, conflicting messages, inconsistent numbers, contradictory instructions, unusual circumstances, and

absence of key documents at face value, rather than probing further into these red flags to determine if this was a legitimate transaction. A fraud plaintiff cannot recover if he blindly relies upon a misrepresentation, the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995). All of these red flags show that ADT's alleged reliance on the Bank employees' statements regarding the counterfeit check was unjustified. We hold ADT failed to establish the justifiable reliance element of its fraud cause of action. *Grant Thornton*, 314 S.W.3d at 923. The record indicates there is no evidence of a material misrepresentation by the Bank, a knowing or reckless misrepresentation by the Bank, or justifiable reliance on the Bank's representation. Accordingly, the trial court correctly granted a summary judgment in favor of the Bank on ADT's fraud claim. *See Merriman*, 407 S.W.3d at 248; *Exxon Corp.*, 348 S.W.3d at 217. We overrule ADT's third and sixth issues.

### OTHER CAUSES OF ACTION

In its fifth issue, ADT contends that the bank improperly charged back its provisional credit for the counterfeit check in the amount of $30,000.00 and the trial court erred in denying its alternative causes of action. ADT further asserts that the trial court erred in granting summary judgment in favor of the Bank on its counterclaim for ADT's breach of UCC warranties.

### Breach of Contract

**\*9** [16] [17] [18]ADT alleged that the Bank's withdrawal of funds from ADT's account was a breach of the deposit agreement and the Bank breached its common law duty to perform. The relationship of a bank to a general depositor is contractual, that of debtor-creditor arising from the depository contract. *Trevino & Assocs. Mech., L.P. v. Frost Nat'l Bank*, 400 S.W.3d 139, 148 (Tex. App.–Dallas 2013, no pet.). The laws of this state govern a deposit contract between a bank and a consumer account holder if the branch or separate office of the bank that accepts the deposit contract is located in Texas. TEX. BUS. & COM. CODE ANN. § 4.102(c). Under the laws of this state, the UCC regulates a bank's handling of deposits and collections for its customers. *Id.* §§ 4.101–.504. The relationship may also be governed in part by agreements between the bank and its customer. *Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n,* 462 S.W.3d 128, 133 (Tex.App.–Houston [1st Dist.] 2015, no

pet.). The UCC, in these relationships, contains a comprehensive and carefully considered allocation of responsibility among parties to banking relationships. *Sw. Bank*, 149 S.W.3d at 107; *Martin*, 29 S.W.3d at 91. Where the UCC applies, common law rules regarding breach of contract do not apply. *Roberts*, 167 S.W.3d at 624. Further, when the UCC applies, common law claims that conflict with the UCC are precluded. *See Contractors Source, Inc.*, 462 S.W.3d at 138.

[19]In a chargeback such as happened here, Section 4.214 of the UCC applies. TEX. BUS. & COM. CODE ANN. § 4.214(a). Any cause of action that ADT had for breach of contract was preempted by the UCC. *Roberts*, 167 S.W.3d at 624. When the Canadian check deposited by ADT was determined to be counterfeit, the Bank was authorized by the UCC to effectuate a chargeback. TEX. BUS. & COM. CODE ANN. § 4.214(a). The chargeback would have also been allowed by the deposit agreement. The trial court did not err by granting the Bank a summary judgment on ADT's breach of contract claim. *See Fernandez*, 315 S.W.3d at 508.

### Equitable Estoppel

[20]ADT asserted that the Bank is estopped to deny that ADT was informed the check had cleared or was good. The doctrine of equitable estoppel requires (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted upon; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations. *Kenneco Energy, Inc.*, 962 S.W.2d at 515–16.

[21] [22]The first element of equitable estoppel required a false statement to ADT by McDougald or Hill. When McDougald and Hill respectively spoke to Payne and Blaase, they were focused on whether the funds were in ADT's account. The uncontroverted evidence is that the funds were in ADT's account due to the provisional credit Blaase had opted for. Neither McDougald nor Hill made a false statement. Therefore, this defense fails. *See Merriman*, 407 S.W.3d at 248.

### Failure to Return Check

[23]In its petition, ADT complained that its claim against the maker of the check is precluded due to the Bank's failure to return the alleged counterfeit check. In its brief, ADT has not argued and analyzed its position on the Bank's failure to return the check. Further, it has not cited

any authority to support its position. Rule 38 of the Rules of Appellate Procedure provides that a brief to the court of appeals shall contain, among other things, "a clear and concise argument for the contentions made, with appropriate citations to authorities in the record." TEX. R. APP. P. 38.1(i); *In re B.A.B.*, 124 S.W.3d 417, 420 (Tex.App.–Dallas 2004, no pet.). The failure to adequately brief an issue, either by failing to specifically argue and analyze one's position or provide citations to authorities, waives any error on appeal. *Id.* Therefore, ADT has waived any error regarding this cause of action.

### Promissory Estoppel

[24] [25]ADT alleged that the Bank consented to inform ADT if the check was not good and was damaged when it relied on Bank employees' statements that the check was good. The requisites of promissory estoppel are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment. *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n. 25 (Tex.2002). If an alleged promise is part of a valid contract, the promisee cannot disregard the contract and sue for reliance damages under the doctrine of promissory estoppel. *BP Am. Prod. Co. v. Zaffirini*, 419 S.W.3d 485, 507 (Tex.App.–San Antonio 2013, pet. denied). Promissory estoppel is not applicable to a promise covered by a valid contract between the parties. *Id.*

*10 [26]As explained above, there was a valid contract between the Bank and ADT with regard to deposits and collections. Therefore, even if this contract was not preempted by the provisions of the UCC related to chargeback on provisional credits, a promissory estoppel cause of action would not have been available to ADT in this case. *See id.* The trial court did not err in granting the Bank's motion for summary judgment on ADT's claim for promissory estoppel. *See Fernandez*, 315 S.W.3d at 508.

### Money Had and Received

[27] [28] [29]ADT alleged that the Bank wrongfully withdrew $30,000.00 from ADT's account and it would be unconscionable for the Bank to retain it. To recover in a cause of action for money had and received, all a plaintiff need show is that the defendant holds money that in equity and good conscience belongs to the plaintiff. *Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686, 687 (1951). This cause of action "looks solely to the inquiry, whether the defendant holds money which belongs to the plaintiff." *Id.* at 687–88. Money had and received is a

common law claim.[1] It is not listed as a cause of action that supplements the UCC. *See* TEX. BUS. & COM. CODE ANN. § 1.103(b). Furthermore, the Bank withdrew the $30,000.00 pursuant to Section 4.214 of the UCC, which gives the Bank the right to charge back the amount previously given for a dishonored item. TEX. BUS. & COM. CODE ANN. § 4.214. Therefore, the common law cause of action for money had and received has been supplanted by Chapter 4 of the UCC. The trial court properly granted summary judgment in favor of the Bank on ADT's claim for money had and received. *See Fernandez*, 315 S.W.3d at 508.

### Negligent Misrepresentation and Conversion

ADT alleged that the Bank's actions constituted negligent misrepresentation and conversion. Causes of action for negligent misrepresentation and conversion must be filed within two years from the date that they occur. If not, the claim is barred by the statute of limitations. TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (West Supp.2014); *Tex. Am. Corp. v. Woodbridge Joint Venture*, 809 S.W.2d 299, 303 (Tex.App.–Fort Worth 1991, writ denied).

[30]Here, the alleged negligent misrepresentation and conversion would have occurred in March 2010. ADT filed its first original petition against the Bank in September 2012. This was more than two years after ADT's cause of action would have accrued, and the negligent misrepresentation and conversion causes of action are therefore barred by the statute of limitations. The trial court did not err in granting summary judgment in favor of the Bank on ADT's negligent misrepresentation and conversion claims. *See Fernandez*, 315 S.W.3d at 508.

### Deceptive Trade Practices Act

[31]Any cause of action filed under the DTPA must be brought within two years after discovery of the deceptive act complained of. TEX. BUS. & COM. CODE ANN. § 17.565 (West 2011). Again, this cause of action would have accrued in March 2010 and suit was not filed until September 2012. ADT's DTPA cause of action is barred by the statute of limitations. *Id.* The trial court did not err in granting summary judgment in favor of the Bank on ADT's DTPA cause of action. *See Fernandez*, 315 S.W.3d at 508.

### The Bank's Counterclaim

The Bank counterclaimed for ADT's breach of warranties under UCC Sections 3.416 and 4.207. *See* TEX. BUS. & COM. CODE ANN. §§ 3.416, 4.207 (West Supp.2014). Pursuant to those sections, ADT warranted that it was entitled to enforce the check sent by Lopez and that the signature on the check was authentic. *Id.*

**\*11** [32]ADT argues that the warranties apply only to checks that are deposited, not those sent for collection. The evidence shows the check at issue was deposited. Additionally, the UCC does not make that distinction regarding warranties. The UCC provides that when a person transfers an instrument for consideration, he provides certain warranties. *Id.* An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument. TEX. BUS. & COM. CODE ANN. § 3.203 (West 2002).

[33]ADT further asserts that Sections 3.416 and 4.207 apply to negotiable instruments and a counterfeit check is not negotiable, but only a facsimile of a negotiable instrument. Again, this is not an accurate distinction. Classification of an item as a negotiable instrument is based on form. TEX. BUS. & COM. CODE ANN. § 3.104(f) (West Supp.2014). The evidence shows that the check at issue was counterfeit. Therefore, ADT breached its warranty that all signatures on the instrument are authentic and that it was entitled to enforce the check. *See* TEX. BUS. & COM. CODE ANN. §§ 3.416, 4.207. Accordingly, the trial court did not err in granting summary judgment in favor of the Bank on its counterclaim for breach of warranties under the UCC. *See* TEX. R. CIV. P. 166a(c).

### *Summation*

ADT has not shown error in the trial court's determination that the Bank is entitled to summary judgment on each of ADT's alternative causes of action, its defense of equitable estoppel, or on the Bank's counterclaim. Accordingly, we overrule ADT's fifth issue.

### *VOLUMINOUS RECORDS*

In its first issue, ADT contends that the trial court erred in striking much of the deposition testimony of Janet Payne, Robert Blaase, Leland Pitts, and Heather McDougald. In response to the Bank's objection, the trial court struck all deposition testimony that was not specifically referenced

in ADT's response to the Bank's motion for summary judgment. ADT argues that the depositions were not voluminous and, in light of today's technology, searching for words can be done electronically.

[34]Rulings concerning the admission or exclusion of summary judgment evidence are reviewed under an abuse of discretion standard. *Barraza v. Eureka Co.*, 25 S.W.3d 225, 228 (Tex.App.–El Paso 2000, pet. denied). A trial court abuses its discretion if it acts without any reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex.1985).

[35] [36] [37]A general reference to a voluminous summary judgment record is inadequate to meet the evidentiary burden in a summary judgment. *Ramirez v. Colonial Freight Warehouse Co.*, 434 S.W.3d 244, 250 (Tex.App.–Houston [1st Dist.] 2014, pet. denied). An appellant has a duty to show that the record supports its contentions. *Blake v. Intco Invs. of Tex., Inc.*, 123 S.W.3d 521, 525 (Tex.App.–San Antonio 2003, no pet.). Here, ADT made reference to portions of each of the four depositions to support its position on the summary judgment. However, it attached each of the four depositions in its entirety. The trial court should not be compelled to sift through hundreds of pages of depositions to search for evidence supporting a summary judgment contestant's contentions. *Guthrie v. Suiter*, 934 S.W.2d 820, 826 (Tex.App.–Houston [1st Dist.] 1996, no writ.). Therefore, the trial court did not abuse its discretion by refusing to consider the remainder of the depositions of Payne, Blaase, McDougald, and Pitts that were not specifically cited to it in ADT's summary judgment response. We overrule ADT's first issue.

### *ATTORNEY'S FEES*

**\*12** Finally, in its fourth issue, ADT challenges the trial court's award of attorney's fees to the Bank on its counterclaim. ADT contends that attorney's fees are not warranted because no actual damages were awarded to the Bank, the Bank presented no claims for affirmative relief, and the services of the Bank's attorneys were only defensive to ADT's claim.

[38] [39] [40]The issue of whether a party is entitled to recover attorney's fees is a question of law for the court to determine. *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 23 (Tex.App.–Tyler 2000, pet. denied). A party may recover attorney's fees only as provided by contract or statute. *Woodhaven Partners, LTD v. Shamoun & Norman, L.L.P.*, 422 S.W.3d 821, 837 (Tex.App.–

Dallas 2014, no pet.). Parties are free to contract for a fee recovery standard either more or less strict than Chapter 38 of the Civil Practice and Remedies Code. *Intercontinental Group P'ship v. K.B. Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex.2009). When parties include an attorney's fee provision in a contract, the language of the contract controls over the language of the statute. *Peterson Group, Inc. v. PLTQ Lotus Group, L.P.*, 417 S.W.3d 46, 88 (Tex.App.–Houston [1st Dist.] 2013, pet. denied) (Keyes, J., dissenting). Whether a party is a prevailing party is based on success on the merits, not the award or denial of damages. *Robbins v. Capozzi*, 100 S.W.3d 18, 27 (Tex.App.–Tyler 2002, no pet.). A prevailing party is one who is vindicated by the trial court's judgment. *Id.*

[41]The deposit agreement between the Bank and ADT included the following clause:

> You also agree to pay all attorney's fees, costs and expenses that financial institution may incur as a result of any claim or action made against financial institution by you or on your behalf related to your account where financial institution is found not to be liable for such

claim.

The Bank sought attorney's fees pursuant to this clause in the deposit agreement. The parties' agreement specifically stated that the Bank would be entitled to its attorney's fees if it was found not to be liable on any claim made by ADT. Although the Bank received no damages or affirmative relief, it was the prevailing party in this litigation due to the fact that it was found not to be liable on the claims made against it by ADT. *Id.* The trial court properly awarded the Bank its attorney's fees. We overrule ADT's fourth issue.

### *DISPOSITION*

We ***affirm*** the trial court's judgment.

### **All Citations**

--- S.W.3d ----, 2015 WL 5439686

Footnotes

1        At common law, this cause of action was known as assumpsit. Michol O'Connor, O'CONNOR'S TEXAS CAUSES OF ACTION 131 (2015).

---

**End of Document**                                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**SEPTEMBER 16, 2015**

**NO. 12-14-00117-CV**

**AMERICAN DREAM TEAM, INC.,**
Appellant
V.
**CITIZENS STATE BANK,**
Appellee

Appeal from the 173rd District Court
of Henderson County, Texas (Tr.Ct.No. 2012A-0911)

THIS CAUSE came to be heard on the oral arguments, appellate record, and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the appellant, **AMERICAN DREAM TEAM, INC.,** for which execution may issue, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*